[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 01-10559
_____

D. C. Case No. 96-00631 CV-B-S

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 08, 2002
THOMAS K. KAHN
CLERK

P. DAVID BAILEY,
DORIS BAILEY,

Plaintiffs-Counter-
Defendants-Appellants,

versus

ALLGAS, INC.,

Defendant-Counter-
Claimant-Appellee,

WILLIAM ERVIN,
LAMPTON-LOVE, INC.,
LIQUIFIED PETROLEUM GAS MANAGEMENT, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(March 8, 2002)**

Before  BLACK, HILL and STAPLETON[*], Circuit Judges.

BLACK, Circuit Judge:

_____

[*]Honorable Walter K. Stapleton, U.S. Circuit Judge for the Third Circuit, sitting by designation.

This antitrust action arises from a price war that erupted between liquid propane gas competitors in northern Alabama. Following the demise of their business, Appellants P. David and Doris Bailey brought suit against competitor Allgas, Inc., alleging the company engaged in discriminatory below-cost pricing in violation of the Robinson-Patman Act and Alabama state law. In support, Appellants offered the expert testimony of an economist. The district court held the expert testimony with respect to key elements of the Robinson-Patman Act claim was inadmissible. Additionally, the district court held Appellants' claims failed even if the testimony was admissible. Accordingly, the district court granted summary judgment. We affirm.

## I.  BACKGROUND

A.   *Factual Background*

Appellee Allgas, Inc. (Allgas) is a distributor and seller of liquid propane gasoline operating in Alabama. Allgas sells propane gas for both residential and industrial use. The company maintains several offices throughout Alabama. Each office exclusively serves a separate district, with the price of propane gas varying

from office to office. The Allgas district offices serving northern Alabama are located in Altoona, Arab, Gadsden, Gardendale and Huntsville.[1]

In August 1984, Allgas hired Appellant P. David Bailey as manager of its Altoona district office. The Altoona office, which is located in eastern Etowah County, serves customers in portions of several counties, including: Blount County, St. Claire County, Etowah County, DeKalb County, and Marshall County. Approximately 50% of the customers served by the Altoona office are residential users; the remaining 50% are comprised of industrial purchasers. Generally, the price of propane gas sold to industrial purchasers is less than the price sold to residential users due to economies of scale, as industrial purchasers receive significantly larger volumes of gas per delivery.[2]

In 1991, Bailey was promoted to manager of Allgas' Gardendale district office, located in Cullman County, Alabama. His brother Max Bailey then was hired as manager of the Altoona office. In October 1993, Bailey became

---

[1] At the time of the price war at issue, Allgas also maintained an office in Winchester, Tennessee, which served, in part, northern Alabama. The Winchester office is now part of Allgas of Tennessee.

[2] As stated by Bailey: "When you got to a point of delivery, you could pump off 1200 just as cheap as you could pump off 6." *See* November 25, 1996 Deposition of Pronce David Bailey (Bailey Depo.) at 62.

3

disgruntled over his compensation and resigned from employment with Allgas. Max Bailey, however, remained as manager of the Altoona office.

Soon after resigning from Allgas, Bailey decided to open a competing liquid propane gasoline business. To fund his new business, Bailey obtained a $400,000 loan from the Small Business Administration (SBA) and a $100,000 personal loan from a friend. In his application for the SBA loan, Bailey stated his intent to hire the "best office worker" and the "two most productive route salesmen" from Allgas' Gardendale office and to hire the "best office worker" and the "two most productive route salesmen" from Allgas' Altoona office. *See* Bailey Depo. at 100-17. Ultimately, Bailey hired four Allgas employees to work for his new business, including his brother Max Bailey.[3]

Bailey and his wife, Doris, opened Bailey's Propane Gas in September 1994. The business was headquartered in Susan Moore, Alabama, which is located in northern Blount County. Susan Moore is approximately ten miles from Altoona, Alabama. The intended service area of Bailey's Propane Gas included portions of three counties: Blount County, Etowah County, and Marshall County.[4] Although

---

[3] Bailey also approached other Allgas employees, including drivers Lowell Gilliland and Amos Caldwell, who did not accept employment with Bailey's Propane Gas.

[4] In their complaint, the Baileys listed Blount County, Etowah County and Marshall County as the intended service area of Bailey's Propane Gas. Later interrogatory responses indicated the service area also might include portions of Cullman County and St. Clair County.

4

the region served by Bailey's Propane Gas and the region served by Allgas' Altoona office overlapped to a certain degree, the two service areas were not coextensive with one another. Additionally, Bailey's Propane Gas only served residential customers.

On or about the day Bailey's Propane Gas opened for business, Allgas cut the price of propane gas offered to residential customers of its Altoona office by 17¢ — from 67¢ per gallon to 50¢ per gallon. The price reduction was effective only in the district served by the Altoona office; no other Allgas district office offered residential gasoline for 50¢ per gallon. The price reduction was a pre-emptive maneuver intended to protect against the loss of customers serviced by the Altoona office.[5] Bailey already had approached several Allgas employees about defecting to his new company, and Allgas was particularly concerned about losing its drivers. Because the nature of the liquid propane business mandates delivery of the product to the consumer, Allgas' drivers generally were the only employees having personal contact with its customers.

Unable to match Allgas' price of 50¢ per gallon, Bailey's Propane Gas offered residential customers a price of 67¢ per gallon. In late December 1994,

---

[5] Robert Love, Jr., vice-president of Allgas, testified that Allgas believed its Altoona office was going to be "the center fix of what [Bailey's Propane Gas was] going to be trying to pick up as far as customers go." *See* Deposition of Robert Y. Love, Jr. at 93.

after experiencing wholesale price increases from its supplier, Allgas raised residential prices to approximately 65¢ per gallon. Over the next few months, Allgas' prices steadily increased. According to the Baileys, however, the prices charged by Allgas did not normalize until July or August of 1995. By August 1995, Bailey's Propane Gas was out of business.

B.     *Procedural Background*

Following the demise of their business, the Baileys brought suit against Allgas.[6] They alleged Allgas had engaged in price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13.[7] The Baileys also put forward a number of state law claims, including a claim for tortious interference with a business or contractual relationship.[8] Allgas counterclaimed, alleging Bailey had misappropriated trade secrets and engaged in intentional interference with its business relations.

---

[6] Bailey also sued Allgas' parent company, Lampton-Love, Inc., a related company, Liquid Petroleum Gas Management, and William Ervin, president of Allgas.

[7] The Baileys also made claims under § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Those claims were dismissed earlier in the proceedings and are not at issue here.

[8] Other state law claims included claims for violation of the Alabama Motor Fuel Marketing Act, the Alabama Unfair Practices Act, emotional distress, and outrage. The emotional distress and outrage claims were dismissed by the district court on or about July 16, 1996. The Alabama Unfair Practices Act claim was dismissed by the district court on or about January 9, 2001. None of these dismissals was appealed. As to the Alabama Motor Fuel Marketing Act claim, the district court agreed to hold the claim in abeyance pending resolution of the instant appeal.

In support of their Robinson-Patman Act claim, the Baileys offered the expert testimony of Dr. William Gunther, then Professor of Economics at the University of Alabama. Shortly before trial, the district court conducted a Rule 104 hearing to determine whether Gunther was qualified to testify concerning essential elements of the claim.[9] In March 1998, following extensive briefing by the parties and a full hearing on the issue, the district court issued a memorandum opinion concluding Gunther's report and deposition were so deficient as to disqualify him from testifying on the antitrust issues. The court then granted summary judgment in favor of Allgas and entered a final judgment under Fed. R. Civ. P. 54(b) dismissing the Baileys' Robinson-Patman Act and tortious interference claims. The Baileys appealed.

On June 11, 1999, this Court reversed the exclusion of Gunther's testimony and vacated the judgment in favor of Allgas, noting "the district court erred by conflating the *admissibility* of Gunther's evidence with the *sufficiency* of that evidence to overcome Allgas's motion for summary judgment." *See Bailey v. Allgas, Inc.*, No. 98-6278, slip op. at 9 (11th Cir. June 11, 1999). Of particular concern was the failure of the district court to assess whether Gunther's

---

[9] "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, . . . ." Fed. R. Evid. 104(a).

methodology was sufficiently reliable as determined by the sort of inquiry mandated under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[10] Although the case was remanded to the district court "for a determination of whether summary judgment [was] still appropriate in light of Gunther's evidence," the Court indicated certain issues could be re-examined on remand:

> We do not address the following issues, which the district court identified but did not reach: 1) Allgas's contention that Gunther's identification of the relevant geographic market is unreliable and must be excluded; and 2) its contention that Gunther's estimation of Allgas's market power is also unreliable and due to be excluded. Nor do we address whether, even with the aid of Gunther's expert evidence, Bailey has failed to raise a genuine issue of material fact with respect to his Robinson-Patman claim, particularly in light of the district court's enumeration of the problems with Gunther's efforts to define a relevant geographic market. The district court may address these and other matters on remand.

*Bailey*, No. 98-6278 at 16 n.5.

On remand, Allgas again moved to strike the testimony of Gunther and for summary judgment. After determining the Court's mandate did not preclude re-examination of Gunther's proposed testimony, the district court[11] found his

---

[10] 509 U.S. 579, 113 S. Ct. 2786 (1993) (discussing the admissibility of scientific expert testimony); *see also Kumho Tire Co. v. Carmichael*, 426 U.S. 137, 147-48, 119 S. Ct. 1167, 1174 (1999) (holding the district court's gatekeeping function applies to all expert testimony, not only scientific testimony).

[11] On remand, the case was reassigned from the Honorable Robert B. Propst to the Honorable Sharon Lovelace Blackburn.

methodology "fail[ed] to meet the criteria of professional soundness and validity that are at the core of *Daubert*'s reliability requirement." *See Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1235-36 (N.D. Ala. 2000). Concluding his report and deposition testimony demonstrated "an utter lack of expertise and reliability," the district court held Gunther's expert testimony was inadmissible under Fed. R. Evid. 702. *Id.* at 1246. Furthermore, the district court held Allgas was entitled to summary judgment because, even if Gunther's opinions were admissible, they did not constitute sufficient evidence to support the Baileys' Robinson-Patman Act claim. *Id.* Finally, in a separate order, the district court granted summary judgment in favor of Allgas on the Baileys' tortious interference claim because the Baileys could not demonstrate Allgas engaged in illegal tactics when lowering its price of residential gas.

The Baileys then filed the instant appeal. On appeal, the Baileys contend the exclusion of Gunther's testimony violates the mandate of the Court's prior opinion. Additionally, the Baileys assert the district court again erred by conflating the admissibility of Gunther's evidence with the sufficiency of that evidence to overcome summary judgment. Finally, the Baileys dispute summary judgment is warranted even if Gunther's testimony is admissible. Because we conclude Allgas

9

is entitled to summary judgment even in light of Gunther's evidence, we do not need to consider the first two issues raised by the Baileys.

## II.  STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment, applying the same standard as the district court.  *See Johnson v. Bd. of Regents of the Univ. of Ga.*, 263 F.3d 1234, 1242 (11th Cir. 2001).  Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We "'view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion'" and "'all reasonable doubts about the facts [are] resolved in favor of the non-movant.'"  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982)).

Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)).  The mere existence of some evidence to support

the non-moving party is not sufficient for denial of summary judgment; there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50, 106 S. Ct. at 2511 (internal citations omitted).

### III. DISCUSSION

A.    *Robinson-Patman Act Claim*

Price discrimination is made unlawful by § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, which provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a) (1997). By its terms, the Robinson-Patman Act only prohibits price discrimination to the extent it threatens to injure competition.

"That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.'"

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224, 113 S. Ct. 2578, 2588 (1993) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S. Ct. 1502, 1521 (1962)). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Id.* at 225, 113 S. Ct. at 2589 (quoting *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S. Ct. 1545, 1548 (1945)).

Cutting prices to meet or beat competitors is the fundamental basis of competition, which makes proving price discrimination difficult. "[T]he mechanism by which a firm engages in predatory pricing — lowering prices — is the same mechanism by which a firm stimulates competition; because 'cutting prices in order to increase business often is the very essence of competition. . . .'" *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122 n.17, 107 S. Ct. 484, 495 n.17 (1986) (quoting *Matsushita*, 475 U.S. at 594, 106 S. Ct. at 1360). "Thus, mistaken inferences in [antitrust cases] are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594, 106 S. Ct. at 1360.

Price cutting designed to purge competition from the market is known as primary-line injury.[12] Such injury occurs in two stages:

> In the first stage, or "price war" period, the defendant sets prices below its marginal cost hoping to eliminate rivals and increase its share of the market. During this phase, the predator, and any rival compelled to challenge the predatory price, will suffer losses. Though rivals may suffer financial losses or be eliminated as a result of the below-cost pricing, injury to rivals at this stage of the predatory scheme is of no concern to the antitrust laws. [*Brooke Group*, 509 U.S. at 224, 113 S. Ct. at 2588.] Only by adopting a long-run strategy is a predator able to injure consumer welfare. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 117, 107 S. Ct. 484, 493, 93 L. Ed. 2d 427 (1986). A long-run strategy requires the predator to drive rivals from the market, or discipline them sufficiently so that they do not act as competitors normally should. *Id.* If the predator reaches this long-run goal, it enters the second stage, the "recoupment" period. It then can collect the fruits of the predatory scheme by charging supracompetitive prices — prices above competitive levels. The predator's hope is that the excess profits will allow it to recoup the losses suffered during the price war. *Brooke Group*, [509] U.S. at [225-26], 113 S. Ct. at 2589.

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433-34 (9th Cir. 1995).

Thus, in order to establish a primary-line injury, an aggrieved plaintiff must prove: (1) the prices complained of are below an appropriate measure of the predator's costs; and (2) the predator had a reasonable expectation of recouping its investment

---

[12] The other type of violation under the Robinson-Patman Act, not at issue here, is called "secondary-line" price discrimination, which involves price discrimination by a seller which affects competition among its buyers. *See Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 580 (Former 5th Cir. 1982).

in below-cost pricing.[13]  *See Brooke Group*, 509 U.S. at 222-24, 113 S. Ct. at 2587-88.

1.    *Below-Cost Pricing*

Under the facts of this case, it is not necessary to address whether Allgas' Altoona district prices fell below an "appropriate measure" of its costs.  The district court did not base its summary judgment ruling on this element, nor does either party raise the issue of price below cost on appeal.  For purposes of this appeal, therefore, we assume the Baileys can prove, at a minimum, there is a genuine issue of material fact as to whether Allgas' Altoona office sold propane gas at a price below an "appropriate measure" of its costs.

2.    *Ability to Recoup Losses*

The ability of a price discrimination scheme to drive competitors from the market through below-cost pricing does not alone constitute an antitrust injury.  Crucial to the determination of an antitrust injury is whether the predator has a

---

[13]  A primary-line injury claim also has a jurisdictional requirement; the discriminatory sales must take place "in commerce."  *See* 15 U.S.C. § 13(a).  This requirement has been interpreted to mean at least one sale, whether it be the below-cost sale or the sale to which the below-cost sale is being compared, must have crossed a state line.  *See Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200-01, 95 S. Ct. 392, 401 (1974).

Whether the Baileys have met the jurisdictional requirement of the Robinson-Patman Act was not raised on appeal.  It is likely, however, the jurisdictional requirement is met.  Although the complaint merely alleged Allgas served a large area in the State of Alabama, the president of Allgas testified that the company's service area also included portions of Tennessee.

rational expectation of later recouping its losses. *See generally Matsushita*, 475
U.S. at 589, 106 S. Ct. at 1357 ("The success of any predatory pricing scheme
depends on *maintaining* [market] power for long enough both to recoup the
predator's losses and to harvest some additional gain."). Price discrimination that
is unaccompanied by an ability to recoup losses only serves to benefit, rather than
injure, consumers:

> Recoupment is the ultimate object of an unlawful predatory pricing
> scheme; it is the means by which a predator profits from predation.
> Without it, predatory pricing produces lower aggregate prices in the
> market, and consumer welfare is enhanced. Although unsuccessful
> predatory pricing may encourage some inefficient substitution toward
> the product being sold at less than its cost, unsuccessful predation is in
> general a boon to consumers.

*Brooke Group*, 509 U.S. at 224, 113 S. Ct. at 2588.

Determining whether recoupment of predatory losses is likely requires a
close analysis of the structure and conditions of the relevant market. In order to
recoup their losses, predators "must obtain enough market power to set higher than
competitive prices, and then must sustain those prices long enough to earn in
excess profits what they earlier gave up in below-cost prices." *Matsushita*, 475
U.S. at 590-91, 106 S. Ct. at 1358; *see also* IIA Phillip E. Areeda et al., Antitrust
Law ¶ 501 (2d ed. 2002) ("Thus, the substantial market power that concerns
antitrust law arises when the defendant (1) can profitably set prices well above its

15

costs and (2) enjoys some protection against a rival's entry or expansion that would erode such supracompetitive prices and profits."). Determining whether Allgas had the ability to recoup its losses sustained by engaging in its allegedly predatory scheme, therefore, requires a bipartite examination of: (a) whether Allgas possessed sufficient market power to set supracompetitive prices, and (b) whether Allgas could sustain supracompetitive prices long enough to recoup its losses.

a.      *Possession of Market Power*

The most common method of demonstrating a predator possesses sufficient market power to set supracompetitive prices is to show the existence of a monopoly. A monopoly may arise where one seller controls all or the bulk of a product's output. *See generally* IIA Areeda, *supra* ¶ 403a (defining the term "monopoly"). A less common method of demonstrating market power is to show the existence of an oligopoly.[14] An oligopoly may arise where a handful of relatively large sellers control the bulk of a product's output. *See generally* IIA Areeda, *supra* ¶ 404a (defining the term "oligopoly"). Whether the Baileys can

_____

[14] Whereas § 2 of the Sherman Act condemns predatory pricing posing a dangerous probability of actual monopolization, the Robinson-Patman Act merely forbids predatory pricing posing a reasonable possibility of harm to "competition." *Compare* 15 U.S.C. § 2 *with* 15 U.S.C. § 13(a). Based on the difference in language between the Sherman Act and the Robinson-Patman Act, the United States Supreme Court has held competitive injury under the Robinson-Patman Act "must extend beyond the monopoly setting." *Brooke Group*, 509 U.S. at 229, 113 S. Ct. at 2591. As a result, the Robinson-Patman Act can be violated when primary-line injury occurs in an oligopoly setting. *Id.*, 113 S. Ct. at 2591.

prove Allgas operated in either a monopoly or an oligopoly environment will be examined in turn.

### 1) *Existence of a Monopoly*

The most direct method of establishing monopoly power is through economic proof, namely, demand and supply curves. *See generally* IIA Areeda, *supra* ¶ 507. Because demand is difficult to establish with accuracy, evidence of a seller's market share may provide the most convenient circumstantial measure of monopoly power. *See generally United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S. Ct. 1698, 1704 (1966) (noting "[t]he existence of such [monopoly] power ordinarily may be inferred from the predominant share of the market"); *U.S. Anchor Mfg. v. Rule Indus., Inc.*, 7 F.3d 986, 999 (11th Cir. 1993) (stating the "principal measure of actual monopoly power is market share").

The first step in assessing a seller's market share is to define the relevant market. *See Rebel Oil*, 51 F.3d at 1434 ("Without a definition of the relevant market, it is impossible to determine market share."). Defining the relevant market requires identification of both the product at issue and the geographic market for that product. *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 276 (5th Cir. 1978). Once the relevant market has been determined, it is possible to calculate a seller's percentage share of that market. Construction of the relevant

market and a showing of monopoly power must be based on expert testimony. *See*

*Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 855 n.4 (11th Cir.

1998).

After a thorough examination of the record, we conclude the evidence

presented by Gunther, the Baileys' sole expert, does not provide a sufficient basis

upon which a reasonable jury could find Allgas possessed monopoly power. As

discussed in more detail below, Gunther's assessment of the relevant product

market was cursory and unclear. In defining the relevant geographic market,

Gunther ignored instructive guidelines set forth in this Court's precedent.

Furthermore, even if the geographic market had been correctly drawn, Gunther

failed to determine Allgas' market share for that particular geographic area.

Finally, even assuming Gunther's determination of Allgas' market share was

correct, the percentage share calculated by Gunther is insufficient as a matter of

law to constitute circumstantial evidence of a monopoly.

a) *Failure to Prove the Relevant Product Market*

A relevant product market does not consist solely of the specific product

over which parties engage in a price war. Rather, in determining a seller's

monopoly power, it is necessary to examine both the product at issue and all

reasonable substitutes available to consumers. "The outer boundaries of a product

18

market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S. Ct. 1502, 1523-24 (1962).

In his preliminary report, Gunther stated the relevant product market was liquid propane gasoline. Additionally, at various times in his report, Gunther indicated the relevant product market was limited to propane gas sold for residential use.[15] *See, e.g.,* Letter from Gunther to L. Vastine Stabler, Jr. enclosing the Preliminary Report (Gunther Letter) at ¶ 2 (stating "there tend to be few product substitutes for propane gas for home heating purposes"); March 19, 1997 Preliminary Report of Dr. William Gunther (Preliminary Report) at 3 ("This report focuses primarily on the second largest use of propane gas, residential/commercial use, and the retailing (marketing) of the propane gas to the final customer."). Despite recognizing propane gas is viewed as homogeneous by the final consumer, Gunther did not analyze whether residential use constitutes a legitimate sub-market for the propane gas market.

Of equal concern is Gunther's cursory assessment of reasonable substitutes for liquid propane gas. Gunther acknowledged the existence of several alternative

---

[15] At the Rule 104 hearing regarding the admissibility of Gunther's testimony, the Baileys contradicted the testimony of Gunther and represented to the district court that the relevant product market consisted of liquid propane gasoline sold to both residential and industrial customers.

residential fuel sources, including electricity, coal, wood, and heating oil.[16]

Nevertheless, he quickly dismissed these alternative sources as reasonable substitutes for propane gas based on the expense of installing or retrofitting heating equipment. *See* Preliminary Report at 7 ("For a home located in the rural areas, there would appear to be limited substitutability of one fuel source for others given the required infrastructure to switch sources."). Despite acknowledging the majority of residential homes have electricity, Gunther immediately dismissed electrical heat as a reasonable substitute for liquid propane gas. His rejection of coal, wood and heating oil heat as reasonable substitutes was equally as brief. Gunther, however, was presented as an expert in economics, not an expert in the liquid propane gas industry. The sole extent of his research on the industry itself consisted of visiting the website of a national liquid propane gas association and placing two brief telephone calls to unknown persons at the association. At no point did Gunther conduct a survey of the homes in the geographic market, or otherwise research the area, to determine the percentage of houses already fitted for alternative heating sources. Gunther also failed to calculate the actual cost of retrofitting the houses in order to determine the cross-elasticity of demand between

---

[16] Allgas' expert, Dr. Robert McLeod, testified there are four main alternatives to propane gas heat: (1) natural gas; (2) electric heat; (3) wood heat; and, (4) coal heat.

propane gas and other fuel sources. In light of these deficiencies, we conclude Gunther's evidence is insufficient to establish the relevant product market.

            b)       *Failure to Prove the Relevant Geographic Market*

The relevant geographic market is "the area of effective competition . . . in which the seller operates, and to which the purchaser can practically turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S. Ct. 623, 628 (1961). Measurement of the relevant geographic market depends on a number of factors, including "[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors." *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991).

In his preliminary report, Gunther indicated the relevant geographic market was comprised of the 20-mile radius encircling Susan Moore, Alabama. In making this determination, however, Gunther failed to properly assess the factors which must be considered when measuring the relevant geographic market. Gunther did not conduct any analysis of the historical prices charged by Allgas and its competitors within northern Alabama. Likewise, Gunther did not determine the

21

location or facilities of any other propane gas retailers. Finally, Gunther's report failed to address customer convenience and preference.

The only factors Gunther considered were transportation costs and delivery limitations. Noting transportation costs are a significant component of final price, Gunther concluded the geographic markets for propane gas are highly localized. Nevertheless, Gunther struggled to pinpoint the actual delivery range applicable to the propane gas market. In his preliminary report, Gunther relied heavily on evidence from Allgas' records, which purportedly indicated most customers resided within a 10-mile radius of the facility from which they were serviced:

> Indeed, based upon Allgas records, the transportation distances from a retailer tank site to customers tends to be in the range of 10 miles one way or 20 miles round trip. That would argue that customers which are more than 20 miles away from the tank site would be better served by a competitor provided they were located closer.

*See* Preliminary Report at 6. In a later portion of his preliminary report, however, Gunther sought to measure the projected annual sales volume available to Bailey's Propane Gas by calculating the number of housing units "within a 20 mile radius" of the company's office. *Id.* at 8. Gunther's deposition testimony was equally as contradictory. On the one hand, Gunther confirmed Allgas' customers were located within 10 miles, one-way, of its tanks. *See* March 19, 1997 Deposition of Dr. William Gunther (Gunther Depo.) at 36. On the other hand, Gunther indicated

22

he assessed market share by using a 20-mile radius. *Id.* at 38-39. Ultimately, it is impossible to determine from Gunther's evidence whether propane gas retailers tend to serve customers within a 10-mile or 20-mile radius of their facilities. The difference between the two is significant — a company which serves customers within a 20-mile radius has a 400% larger service area than a company with a service area of 10 miles.[17]

Regardless of the inconsistencies regarding delivery limitations in the retail propane gas market, Gunther's determination of the relevant geographic market is unacceptable as a matter of law. In his deposition, Gunther admitted he chose the 20-mile radius surrounding Susan Moore as the relevant geographic market solely because it coincided with the intended service area of Bailey's Propane Gas:

> Q. . . . Now, I just want to make sure I understand your testimony right. The radius for what the relevant market is should be 10 miles from the headquarters?
> A. No. The AllGas material shows that their average distance was 11 miles but Mr. Bailey testified or I'm told he did, that his intended radius, or where he would go, would be about 20 miles.
> Q. Okay
> A. So I used a 20 mile radius for Susan Moore.

Gunther Depo. at 78; *see also* Gunther Depo. at 80 ("The Susan Moore Market was a 20 mile radius because Mr. Bailey said that was what he intended to drive in

---

[17] The area of a circle with a 10-mile radius is approximately 314 square miles; the area of a circle with a 20-mile radius is approximately 1256 square miles.

23

order to serve his customers."). The law is clear, however, that a geographic market cannot be drawn simply to coincide with the market area of a specific company. *See Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th Cir. 1985) ("The relevant market is the 'area of effective competition' in which competitors generally are willing to compete for the consumer potential, and not the market area of a single company."). Based on these deficiencies, Gunther's evidence is insufficient to establish the relevant geographic market.

c)     *Failure to Establish Market Share*

Once the relevant market has been defined, both in terms of the relevant product market and the relevant geographic market, a predator's percentage share of that market can be determined. Measurement of a predator's market share is necessary to assess whether the predator possesses sufficient leverage to influence marketwide output. *See Rebel Oil v. Atl. Richfield Co.*, 51 F.3d 1421, 1437 (9th Cir. 1995); *see also* IIA Areeda, *supra* at ¶ 403a. A monopolistic predator controls such a large portion of the market that its own restriction of output results in a market-wide reduction which cannot be offset by the expanded output of competitors. *Rebel Oil*, 51 F.3d at 1437. Such a predator has the power to charge supracompetitive prices merely by restricting its own output. *Id.*

The evidence presented by Gunther failed to demonstrate Allgas possessed a sufficiently large share of the relevant market for it to be characterized as a monopolist. First, Gunther neglected to calculate Allgas' market share *of the purportedly relevant market*. Moreover, even if Gunther's estimate of market share was for the correct market, the market share attributable to Allgas was insufficiently low to infer the existence of monopoly power.

      i)     *Market Share of the Incorrect Market*

Several propane gas retailers competed against Allgas and Bailey's Propane Gas in northern Alabama, including Dowdle Gas, Ferrell Gas, Country Gas, Amerigas, Jordan Gas, Empire Gas, and Southland Gas. Gunther, however, did not personally assess the market shares of any of these competitors within the purported relevant market, an area defined by Gunther as encompassing the 20-mile radius surrounding Susan Moore. In lieu of conducting his own analysis, Gunther relied on the affidavit Max Bailey for generalized estimates of market share. In his affidavit, Max Bailey estimated Allgas' overall market share as 35-40% and its market share of sales to residential customers at close to 50%.[18] The overall market shares of competitors was estimated to be 35-40% for Dowdle Gas,

_____

[18] Because Allgas' main competitor, Dowdle Gas, purportedly served a larger percentage of agricultural customers, Max Bailey estimated Allgas' share of the residential market was significantly higher than its share of the overall market.

25

20-30% split between Ferrell Gas and Country Gas, and the remaining small percentage split between Amerigas, Jordan Gas, Empire Gas, and Southland Gas. Adopting these estimates, Gunther concluded Allgas possessed a 35-40% overall share of the relevant market and a close to 50% residential share of the relevant market.

Regardless of the propriety of an expert relying solely on the opinion of a lay witness when measuring market share, Gunther's reliance on Max Bailey's affidavit is fundamentally flawed because Bailey did not estimate market shares for the purportedly relevant market. Rather, Max Bailey estimated the market shares of Allgas and its competitors for "the Altoona District." *See* April 8, 1997 Affidavit of Max Bailey at ¶ 6. The "Altoona District" was defined as the service area of Allgas' Altoona district office. *Id.* ¶ 5. The service area of Allgas' Altoona district office, however, was not coextensive with the service area of Bailey's Propane Gas; *i.e.*, the "Altoona District" was not limited to the 20-mile radius surrounding Susan Moore. The affidavit of Max Bailey, therefore, reveals nothing about the respective market shares of competitors within a 20-mile radius of Susan Moore. As a result, Gunther's reliance on the affidavit for his sole evidence of

26

market share is insufficient to establish the market share of Allgas in the allegedly relevant market.[19]

ii)    *Insufficiently Low Market Share*

Even if Gunther's measurement of market share was correct, such that Allgas possessed 35-40% of the overall propane gas market and close to 50% of the residential propane gas market surrounding Susan Moore, these market shares would be insufficient circumstantial evidence that Allgas was a monopolist.  A market share at or less than 50% is inadequate as a matter of law to constitute monopoly power.  *See, e.g., Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1368 (5th Cir. 1976) (finding 20% market share insufficient); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993) ("we have discovered no cases in which a court found the existence of actual monopoly established by a bare majority share of the market"); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969) (indicating "something more

---

[19] Gunther's preliminary report itself demonstrates a flaw in his conclusion Allgas controls almost 50% of the allegedly relevant market.  Using data from the 1990 Census, Gunther estimated there were approximately 16,657 residential homes in the "Susan Moore market" which used liquid propane gas.  *See* Preliminary Report, at 8.  Assuming each residential customer consumed between 600 and 1,500 gallons of propane gas during the year, Gunther estimated potential residential demand in the relevant market of between 9,994,221 and 24,985,553 gallons per year.  *Id.*  Allgas records, however, indicate domestic sales by its Altoona district office of no more than 1,370,000 gallons per year.  Thus, even if all of the propane gas sold by the Altoona office was sold within the "Susan Moore market," Allgas would possess a market share in the relevant market of between 5.48% to 13.7%.

27

than 50% of the market is a prerequisite to a finding of monopoly"); IIIA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 801a (2d ed. 2002) ("Although one cannot be too categorical, we believe it reasonable to presume the existence of substantial single-firm market power from a showing that the defendant's share of a well-defined market protected by sufficient entry barriers has exceeded 70 or 75 percent for the five years preceding the complaint.").  As a result, we conclude the Baileys cannot establish Allgas possessed market power through the existence of a monopoly.

### 2)  *Existence of an Oligopoly*

An oligopoly differs from a monopoly in that no one firm can control the market price of a product merely by altering its own output.  IIA Areeda, *supra* ¶ 404a.  Where a market is highly concentrated, however, it is possible for sellers to share market power sufficient to control prices "by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Group*, 509 U.S. at 227, 113 S. Ct. at 2590.  "Thus, the distinctive characteristic of oligopoly is recognized interdependence among the leading firms: the profit-maximizing choice of price and output for one depends on the choices made by others."  IIA Areeda, *supra* ¶ 404a.

The hallmark of an oligopoly is tacit collusion among competitors. Although economic theory suggests oligopolies can arise in any market comprised of only a handful of competitors, the practical realities of the marketplace make the actual existence of an oligopoly unlikely:

> Firms that seek to recoup predatory losses through the conscious parallelism of oligopoly must rely on uncertain and ambiguous signals to achieve concerted action. The signals are subject to misinterpretation and are a blunt and imprecise means of ensuring smooth cooperation, especially in the context of changing or unprecedented market circumstances. This anticompetitive minuet is most difficult to compose and to perform, even for a disciplined oligopoly.

*Brooke Group*, 509 U.S. at 227-28, 113 S. Ct. at 2590. Nevertheless, the United States Supreme Court has recognized the possibility that competition could be injured through the operation of a successful oligopoly. *See generally id.* at 229, 113 S. Ct. at 2591.

The method by which an aggrieved competitor can prove the existence of an oligopoly has not been extensively discussed by the courts. The most reliable method of proving an oligopoly may be through extensive analysis of the historical price and output data for all the competitors within a relevant market. By examining such data, and even comparing the data with similar retailers operating in non-oligopolistic markets, it may be possible to discern whether there is an interdependence in price and output between leading retailers in the market. It also

29

may be possible to discern whether the prices charged in the relevant market are inflated as compared with non-oligopolistic markets. In this case, however, we need not decide whether such evidence would be sufficient to prove the existence of an oligopoly, as Gunther made no attempt to analyze the historical price and output data of Allgas and its competitors.

Despite failing to analyze the interdependence of retailers within the alleged relevant market, Gunther nevertheless concluded Allgas' Altoona office operated within an oligopoly. This conclusion was based on his determination the company as a whole extracted supracompetitive profits in 1993 and 1994. The method by which Gunther determined Allgas earned supracompetitive prices was to compare Allgas' estimated rate of return on assets (ROA) for those two years with the average rate of return for Fortune 500 companies.[20] For example, finding Allgas earned a 12.12% ROA in 1993 as compared with an average Fortune 500 ROA of 3.5%, Gunther concluded "in 1993, Allgas, Inc. earned a supranormal profit in the retail marketing of propane gas and the Altoona, Alabama market was a significant

---

[20] Even after acknowledging the calculation of ROA should be based on after-tax profit, Gunther used Allgas' estimated change in retained earnings as a proxy. Gunther then compared Allgas' ROA with the average ROA for Fortune 500 companies, which Gunther assumed was based on after-tax profit rather than retained earnings. The propriety of using change in retained earnings will not be addressed herein.

contributor to the supranormal profits being earned by Allgas, Inc." *See* Gunther Letter, ¶ 4.

As an initial matter, we are highly skeptical of the reliability of Gunther's methodology in measuring oligopoly power. Although the consistent extraction of supracompetitive profits may be an indication of anticompetitive market power, such profits could just as easily be obtained as a result of good management, superior efficiency, or differences in accounting, none of which is inconsistent with an efficient market. *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 981 (N.D. Cal. 1979).

More troubling is Gunther's use of a seller's ROA to measure supracompetitive profits. A company's ROA is based upon data collected and analyzed by accountants, not economists. As a result, these rates of return are

more a reflection of various accounting conventions than true economic profit.[21]  A

---

21

       *Differences between accounting and economic costs*.  Accounting profits differ from economic profits in several important ways.  *First*, accountants try to determine costs (and profits) for the firm (or perhaps a division of it) over some regularized period, such as a year or a quarter.  By contrast, the economist wants to know the profitability of a project over its entire lifetime, including all planning and investment costs, and "spillovers."  Any given project might show accounting losses in one year and profits in the next, but the final accounting is the only important one for the economist.  Unlike the accountant, moreover, the economist measuring monopoly profit is less interested in the total of a firm's profits made from all its various projects over the firm's life.  Rather, the antitrust analyst wants to know whether the firm now has market power over some particular product (or group of products).

       *Second*, accountants identify costs by looking at historical expenditures, while economists count so-called *opportunity* costs.  The opportunity cost of capital, sometimes called the *normal rate of return*, or *profit*, is the smallest payment that must be made to the owners of a firm's capital to induce them to invest in the firm, rather than in their next best investment alternative.  This rate of return precisely compensates investors for the profit they could achieve elsewhere that they have foregone by investing in the firm.  Economists regard capital's opportunity cost as a cost and define *economic profit* as the return to investors *above and beyond* what is necessary to induce them to invest.  By excluding such costs, accounting profits exceed economic profits.  Thus, the perfectly competitive firm in equilibrium earns zero economic profits though its normal returns are reflected in positive accounting profits.  Hence, substantial accounting profits — say, 20 percent — may be consistent with trivial or zero economic profit and thus do not necessarily indicate any market power.

       Accounting costs fail to reflect opportunity costs in other respects as well.  For example, accountants depreciate durable resources on the basis of their historical cost.  By contrast, the economic value of a resource is determined by its value to the owner in the best alternative use.  With any inflation, historical costs understate economic costs — increasing so as the asset is more durable — such that accounting profit exceeds economic profit.  Consider the accounting treatment of a warehouse that the firm either rents for $1,000 monthly or owns.  The accountant counts the rental as a cost.  But if the warehouse is owned, it may count for much less.  If the warehouse is fully depreciated and there is no mortgage interest, the accountant may count the "cost" of owning the warehouse as zero, not counting maintenance and taxes.  But this warehouse still "costs" the firm the $1,000 it foregoes by using the warehouse itself rather than renting it to others at the $1,000 market price.  Whether owned or rented, the warehouse is a necessary productive input whose value in its best alternative use (in this case,

company's ROA, thus, reveals very little about its market power:

> [T]he rate of return indicated by accounting data is greatly influenced by the firm's growth rate, accounting procedures, the useful life of its assets and the way that those assets are depreciated, and which expenses are capitalized or treated as current costs. Moreover, when a firm produces products in addition to the one under scrutiny, there may be serious dispute over the allocation of overhead and joint costs. These factors are largely irrelevant to economic profit. The overall picture suggests extreme caution in using such data to infer market power.

IIA Areeda, *supra* ¶ 516f1. In light of these inadequacies, it is not surprising the use of ROA to measure market power has yet to be accepted by any circuit. *See generally Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) ("[N]ot only do measured rates of return reflect accounting conventions more than they do real profits (or losses), as an economist would understand these terms, . . . but there is not even a good economic theory that associates monopoly power with a high rate of return.").

Even if ROA legitimately could be used to measure market power, the comparison of a company's ROA to the average ROA for Fortune 500 companies, over the course of only two years, would be insufficient to prove supracompetitive profits indicative of an oligopoly. In order for the comparison to have any

---

renting it to someone else) must be considered before finding economic profits.

IIA, Areeda, *supra* ¶ 516f1.

significance, the predator's ROA must be measured against the ROA of similar firms in the same or similar industries. "One must have not only industries with the same risk level, but also assets that have been evaluated and depreciated in the same way, and markets that have faced the same growth rate." IIA Areeda, *supra* ¶ 516f2. Simply comparing a predator's ROA with the average ROA of the Fortune 500, which contains a broad cross-section of industries and types of companies, will not provide a true measure of excessive returns.[22]

---

[22] In his deposition, Gunther appeared to recognize a better comparator to Allgas' ROA would have been the ROA for the liquid propane gas industry:

> A. Well, you have to have some reference point. If I'm selling ball point pens and I'm making a 50 percent return on my investment, but the average ball point pen maker in the whole U.S. is making five percent return on investment, then, without knowing what the other players are in my market, then I'm obviously doing better than my opportunity costs of being somewhere else, then one can conclude that you're making an economic profit.
> Q. So at least you need to know what the industry average is?
> A. You need a reference point, yeah, to — to know. Because the idea of super normal is above that which is an average or normal, super normal. What's normal? Normal is when — if you could go to the bank and put your money in six percent and that's your opportunity cost, then you're not making a profit until you at least cover that.
> Q. But if you are manufacturing pens, you are not going to compare that rate of return to, say, someone who is manufacturing silicon chips, right?
> A. No. You would have to make the next best available opportunity so it would not be a brain surgeon or a garbage collector.

Gunther Depo. at 76-77. Later, when asked about his use of the ROA for Fortune 500 companies, Gunther stated: "Unfortunately, there is no data that I could find anywhere that talked about the average profitability of a propane retail marketer. That was one of the questions that I asked of this lady at the National Propane Gas Association and she said that I really needed to talk to Bill Butterball in Washington, D.C., who's the director of regulatory affairs and he was not available." *See* Gunther Depo. at 104-05. Gunther did not make any other efforts to find data for companies similar to Allgas.

Not only would a company's ROA need to be compared against an appropriate benchmark, but the ROA also would need to be compared over the course of several years. "Whatever the structure of the market, excess returns are a necessary ingredient of the dynamic adjustment of an industry's capacity to respond to changes in demand." IIA Areeda, *supra* ¶ 516b. When demand increases, existing firms may enjoy a period of inflated profits until such time as existing competitors can expand their capacity or new entrants provide additional supply. *Id.* The mere existence of supracompetitive profits for some period of time, thus, may be entirely consistent with an effective market. Only when excess returns are persistent over a longer period of time may there be an indication of an

---

In a supplemental affidavit, Gunther purported to compare Allgas' ROA with the ROA of companies within the 5900 category of Moody's Industrial Review (propane gas companies are classified under 5984). *See* April 11, 1997 Affidavit of William Gunther. An examination of the comparators reveals they consisted of retail drug stores, including Arbor Drugs, Inc., Walgreen Co., and Eckert Corp. *Id.* These companies are in no way similar to Allgas or its industry. Comparison with these companies, therefore, is meaningless.

35

unhealthy market.[23] *See generally id.* ¶ 516f2 (indicating one to five years is not a

sufficient amount of time to compare rates of return).

Gunther's own analysis demonstrates the need to measure ROA over the

course of several years. In his report, Gunther presumed Allgas operated in an

oligopoly because its ROA for 1993 was 12.12% and its ROA for 1994 was

12.55%. Noting the Fortune 500 average ROA for 1993 was 3.5%, Gunther

concluded Allgas earned supracompetitive profits and, from this, Gunther inferred

the existence of an oligopoly.[24] Omitted from Gunther's report, however, were

---

[23] In his deposition, Gunther himself admitted his methodology would need to be applied over the course of several years:

> Certainly, if a company is earning economic profits in one year, and you say, well, you know, should the Justice Department begin to take action? You would say that doesn't make a lot of sense because the way the market is suppose to work is that the presence of the super normal profits becomes a market signal for entry. And so what you want to do is allow opportunity for entry to occur. And competition will take care of the problem. So you don't want to have a lot of heavy regulations. But if you were observing that a company, let's take the ready to eat cereal anti-trust case, where for 8 or 10 or 15 years one could show that they were earning super normal profits, well, then it's clear that entry wasn't taking care of the problem and that's why the Justice Department brought the suit. So, no, I would not say that super normal profits in one year is a clear indication. While it isn't of something wrong, it's an indication that the economic profits to be made or one ought to look at the opportunity for economic profits to be made because there are these super normal profits.

*See* Gunther Depo. at 102-03. As discussed *infra,* Gunther only included the data for two years in his preliminary report despite measuring Allgas' ROA over the course of four years.

[24] Interestingly, Gunther's assessment of ROA led to the following conclusion: "Economic theory suggests that these economic profits would attract competition and new firms would be expected to enter the market." Preliminary Report at 9. As discussed *infra*, the existence of elevated profits for some period of time may be indicative of a perfectly competitive

36

Allgas' ROAs for 1992 and 1995. According to Gunther's calculations, Allgas had a negative ROA of –7.3% in 1992, and a minimal ROA of 4.10% in 1995. Thus, Gunther's own calculations indicated Allgas was not earning supracompetitive profits in 1992 and 1995. Gunther's complete ROA calculations, therefore, belie the existence of an oligopoly. Especially in light of its ROAs for 1992 and 1995, the fact Allgas may have enjoyed supracompetitive profits in 1993 and 1994 is insufficient to establish the existence of an oligopoly.[25]

An additional deficiency with Gunther's methodology was measurement of the ROA for Allgas as a whole rather than for its Altoona, Alabama district. The oligopoly alleged by the Baileys existed in and around the geographic area serviced by Allgas' Altoona district office. Gunther, however, did not measure the retained earnings of the Altoona district office to determine whether that office, in fact, was earning supracompetitive profits. Rather, Gunther calculated the ROA of the entire company. Allgas operates in the entire state of Alabama, but the Altoona district covers only a small portion of the state. As a result, even if the company as a

market where the supranormal returns serve as a signal to new entrants. The fact that returns are inflated for a short time, therefore, does not itself indicate the market operates as an oligopoly.

[25] When asked in his deposition about the omission of Allgas' ROAs for 1992 and 1995, Gunther indicated: "But what I'm trying to establish here is whether there is sufficient reason for the entry of new firms. Was there the presence of economic profits being earned at the time Mr. Bailey was considering entering the market?" *See* Gunther Depo. at 96-97. The purpose of Gunther's testimony, however, was to demonstrate Allgas operated within an oligopoly, not whether it was rational for the Baileys to enter the market.

whole was earning supracompetitive profits as alleged by Gunther, that fact alone indicates nothing about whether the Altoona district was the cause of such profits. Consequently, Gunther's measurement of ROA for the entire company, without more, is virtually meaningless.[26]

Even if the existence of an oligopoly could be substantiated through measurement of ROA, and even if Gunther's methodology was not otherwise fundamentally flawed, his evidence nevertheless is insufficient to demonstrate Allgas' Altoona district operated within an oligopoly. According to Gunther's testimony, Allgas earned supracompetitive profits in 1993 and 1994. The primary period of predation, however, occurred in 1994. Purportedly, Allgas dropped the residential price of its propane gas to 50¢, a price allegedly below its costs, in September 1994. Allgas did not raise its prices until late December 1994. If Allgas was engaging in predation during one-third of the year, it is illogical the company would have earned supranormal profits for 1994. Gunther's evidence,

---

[26] Gunther himself acknowledged the need to focus on the Altoona district:

Q. . . . . But for our purposes in terms of determining whether there are excess economic profits for the Altoona office, the best test would have been to evaluate the asset base there, what their retained earnings were for the office, right?
A. That's correct.

Gunther Depo. at 87-88.

38

therefore, is inconsistent with the facts. Based on the foregoing, we conclude

Gunther's testimony is insufficient to prove the existence of an oligopoly.

b.     *Ability to Sustain Supracompetitive Prices*

Even if the Baileys could prove Allgas possessed sufficient market power to

set supracompetitive prices, whether through the existence of a monopoly or an

oligopoly, they also would need to demonstrate Allgas could sustain the

supracompetitive prices long enough to recoup its losses. The key to an antitrust

violation is the ability to recoup losses incurred:

> The success of any predatory scheme depends on *maintaining*
> monopoly power for long enough both to recoup the predator's losses
> and to harvest some additional gain. Absent some assurance that the
> hoped-for monopoly will materialize, *and* that it can be sustained for a
> significant period of time, "[t]he predator must make a substantial
> investment with no assurance that it will pay off."

*Matsushita*, 475 U.S. at 589, 106 S. Ct. at 1357 (quoting Easterbrook, Predatory

Strategies and Counterstrategies, 48 U. Chi. L. Rev. 263, 268 (1981); *see also* III

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 724b (2d ed. 2002)

("Recoupment requires not merely that post-predation monopoly prices be

maintainable, but that they be of sufficient duration and magnitude to offset the

costs of predation, even after the costs are adjusted for the risk and time value of

the earlier investment in predation."). Without the ability to maintain inflated

39

prices long enough to recoup losses, competition is not ultimately injured by the prior predatory pricing.

In his preliminary report, Gunther stated Allgas incurred approximately $557,502 in losses as a result of its price war with Bailey's Propane Gas. Gunther projected Allgas would recoup its losses in 8.7 years. Taking into consideration the present value of money, Gunther estimated full recoupment in approximately 10 years. In reaching this conclusion, however, Gunther failed account for structural factors in the market that would affect Allgas' ability to maintain supernormal prices for 10 years. *See* III Areeda & Hovenkamp, *supra* ¶ 724b ("If structural factors indicate that monopoly or oligopoly prices could not be maintained for a significant time after the predation campaign has destroyed or disciplined rivals, then such 'recoupment' is not possible, and the claim must be dismissed.").

The most significant structural factor bearing on the ability to recoup predatory losses through inflated prices is the ease or difficulty of entry into the market. Where a market has low barriers to entry, sellers charging supracompetitive prices will soon attract new competitors. *See, e.g., Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("[W]ith easy entry, a predator charging supracompetitive prices will quickly lose market share (as well

as any chance of reaping monopoly profits) as new rivals enter the market and undercut its high price."). Entry barriers include trade secrets, patents, licenses, capital outlays required to start a new business, pricing elasticity, and difficulties buyers may have in changing suppliers. *See McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1495 (11th Cir. 1988).

In his preliminary report, Gunther conceded the lack of barriers to entry by new liquid propane gas retailers:

> Given the economic profits being earned by Allgas, Inc. and the likelihood of the entry of new firms, the question of the existence of barriers to entry arises. There do not appear to be any significant barriers to entry in the retail marketing of propane gas. . . . Entry barriers must be characterized as relatively weak and given information on the existence of economic profits in the industry, entry of new firms would be expected.

Preliminary Report at 9. Furthermore, Gunther failed to demonstrate the inability of existing firms to expand their output in response to a predator's attempts to raise prices above competitive levels. In light of these facts, we conclude Gunther's evidence is insufficient to demonstrate Allgas could maintain supracompetitive prices long enough to recoup its losses.

B. *State Law Claim for Tortious Interference*

In addition to arguing Allgas violated the Robinson-Patman Act by lowering the residential price of its propane gas to 50¢ per gallon, the Baileys also contend

41

the price reduction unlawfully induced its potential customers to purchase propane gas from Allgas rather than Bailey's Propane Gas. As a result, the Baileys assert a claim for tortious interference with contractual or business relationships.

The tort of intentional interference with business or contractual relations requires: (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; (4) absence of justification for the defendant's interference; and, (5) damage to the plaintiff as a result of the defendant's interference. *Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590, 597 (Ala. 1986). As noted in *Gross*, the fourth element of a claim for tortious interference with business relations, the absence of justification, actually relates to an affirmative defense to be pleaded and proved by the defendant. *Id.* at 597 n.3. Legitimate business competition qualifies as justification for intentional interference with a rival's business. *Soap Co. v. Ecolab, Inc.*, 646 So. 2d 1366, 1369 (Ala. 1994) ("'One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. And he may seek to

do so directly by express inducement as well as indirectly by attractive offers of his own goods or services.'") (quoting Restatement (Second) of Torts, § 768 (1977)).

In response to the Bailey's claim for tortious interference, Allgas raised the defense of justification. Allgas produced evidence that, in regard to the matters in dispute, it was attempting to protect its own clients from being lured away by Bailey's Propane Gas. Allgas also lowered its price to prevent defection by its drivers, who fostered the closest relationships with its customers.[27] Thus, because Allgas produced evidence it was engaging in legitimate business competition, the burden shifted to the Baileys to show a genuine issue of material fact existed.

In response to Allgas' justification defense, the Baileys assert Allgas did not engage in legitimate business competition because the company violated the Robinson-Patman Act when it reduced the price of its residential propane gas. As discussed *supra*, however, the Baileys have failed to set forth sufficient evidence upon which a jury could find Allgas violated the Robinson-Patman Act. Likewise, the Baileys have failed to set forth sufficient evidence disputing Allgas' evidence of legitimate business competition; that is, the Baileys have failed to submit sufficient evidence upon which a jury could find absence of justification. The

---

[27] Allgas drivers earned compensation via a combination of base salary and commission, with commissions comprising approximately 45% of the total compensation. Allgas was concerned erosion of its customer base would convince drivers to switch employment to Bailey's Propane Gas, thereby further reducing its clientele.

district court, therefore, correctly granted summary judgment in favor of Allgas on the Bailey's tortious interference claim. *See generally Bridgeway Communications, Inc. v. Trio Broad., Inc.*, 562 So. 2d 222 (Ala. 1990) (granting summary judgment in favor of defendant where the plaintiff failed to demonstrate a genuine issue of material fact disputing the existence of legitimate business competition).

## IV. CONCLUSION

Regardless of whether the testimony of the Baileys' expert is admissible, we conclude the testimony is insufficient to establish a violation of the Robinson-Patman Act. Not only did the expert fail to prove Allgas possessed sufficient market power to set supracompetitive prices, but he also failed to show Allgas could sustain such supracompetitive prices long enough to recoup its losses incurred in the alleged price discrimination. Accordingly, we affirm summary judgment in favor of Allgas.

AFFIRMED.