**GULFSTREAM PARK RACING ASSOCIATION, INC., a Florida corporation, Plaintiff,**

v.

**TAMPA BAY DOWNS, INC., a Florida corporation, et al., Defendants.**

**No. 803CV135T30EAJ.**

United States District Court,
M.D. Florida,
Tampa Division.

Nov. 7, 2003.

---

1292

Leslie III Joughin, Akerman Senterfitt, Tampa, FL, Keith E. Rounsaville, Akerman Senterfitt, Orlando, FL, Lawrence D. Silverman, Akerman Senterfitt, Miami, FL, for Gulfstream Park Racing Association, Inc., a Florida corporation, plaintiff.

David Thomas Knight, Lara J. Tibbals, Hill, Ward & Henderson, P.A., Tampa, FL, Robert W. Clark, Smith, Clark, Delesie, Bierley, Mueller & Kadyk, Tampa, FL, for Tampa Bay Downs, Inc, a Florida corporation, defendant.

James Maxwell Landis, Jon P. Tasso, Foley & Lardner, Tampa, FL, for Florida Jai-Alai, Inc., Jacksonville Greyhound Racing, Inc., Investment Corp. of Palm Beach.

J. Stephen Menton, Div. of Admin. Hearings. Tallahassee, FL, Harold F. X. Purnell, Rutledge, Ecenia, Purnell & Hoffman, P.A., Tallahassee, FL, for Daytona Beach Kennel Club, Inc., Sports Palace, Inbc., Hartman-Tyner, Inc., West Flagler Associates, Inc., Southwest Florida Enterprises, Inc., St. Petersburg Kennel Club, Inc. and Associated Outdoor Clubs, Inc., Washington County, Sarasota Kennel Club, Inc.

George Lee Waas, Atty. General's Office, Tallahassee, FL, Ralf Edgar Michels, law Office of Ralf E. Michels, Tallahassee, FL, for State of Fla.

## ORDER

MOODY, District Judge.

THIS CAUSE comes before this Court upon:

1. Gulfstream Park Racing Assn., Inc.'s ("Gulfstream") Motion for Summary Judgment on counts 3 and 5 of its second amended complaint (Dkt.# 92) and Tampa Bay Downs, Inc.'s ("TBD") response (Dkt.# 133) thereto;

2. Gulfstream's Motion for Summary Judgment on counts 2 and 3 of TBD's counterclaim (Dkt.# 90) and TBD's response (Dkt.# 133) thereto;

3. TBD's Motion for Summary Judgment on all counts of Gulfstream's second amended complaint and count 1 of its counterclaim (Dkt.# 88) and Gulfstream's response (Dkt.# 117) thereto; [1]

4. Gulfstream's Motions to Strike Expert Reports of Eugene Christiansen and Louis Guth (Dkts.# 63, 69) and TBD's response (Dkt.# 81) thereto;

5. Gulfstream's Motion to Exclude Declarations of Guth and Christiansen (Dkt.# 87) and TBD's response (Dkt.# 110) thereto;

6. Gulfstream's Motion to Strike or Exclude certain portions of declarations and

---

1. In its response, Gulfstream asked this Court to grant Gulfstream summary judgment on counts 1 and 2 (preemption) of its second amended complaint.

depositions (Dkt.# 138) and TBD's response (Dkt.# 148) thereto; and

7. Gulfstream's Emergency Motion to Exclude Evidence of Damages for Violation of Mandatory Disclosure Requirements (Dkts.# 151, 152) and TBD's response (Dkt.# 158) thereto.

## I. BACKGROUND

This is an action between two competing thoroughbred racetracks.[2] Plaintiff/Counter-defendant, Gulfstream, operates a thoroughbred racetrack in Hallandale, Florida, which conducts live horse racing from January through April each year. Defendant/Counter-plaintiff, TBD, operates a thoroughbred racetrack in Tampa, Florida, which conducts live horse racing from December of one year through May of the next year.

## A. FLORIDA'S PARI–MUTUEL INDUSTRY

Both racetracks are part of Florida's pari-mutuel industry. The pari-mutuel industry mainly consists of venues conducting pari-mutuel sports such as horse racing, jai alai, and greyhound racing.[3] A number of state statutes and regulations as well as some federal statutes form a comprehensive regulatory regime, governing nearly every aspect of the industry.

Individuals who attend events at a pari-mutuel venue can either wager: (a) on live races or contests that are taking place at that venue; or (b) on non-live races or contests occurring elsewhere both inside and outside of Florida that are simulcast to those racetracks. The non-live simulcast events are subdivided[4] into: (1) races or contests occurring at other venues in Florida, referred to as intertrack wagering ("ITW"), Fla. Stat. § 550.002(17); (2) out-of-state thoroughbred horse races simulcast to a Florida thoroughbred racetrack then conducting live racing; (3) out-of-state thoroughbred horse races simulcast to a pari-mutuel venue not conducting live thoroughbred horse racing,[5] referred to as intertrack wagering simulcasting ("ITWS").[6]

In order to bring in an out-of-state racetrack's signal into Florida, Florida law requires an out-of-state thoroughbred racetrack and an in-state thoroughbred racetrack (which is conducting live racing) to enter into a contract to provide simul-

2. In addition, the State of Florida, and a number of greyhound racetracks, jai alai frontons, and Ocala Breeder Sales, Inc. (a training facility) intervened as Defendants in this action. The three intervening defendants (the two pari-mutuel groups and the State of Florida) joined in TBD's motion for summary judgment with respect to counts 1, 2, and 3 (preemption and enforceability of exclusive dissemination agreements) of Gulfstream's second amended complaint (Dkts.# 133, 140, 145).

3. Ocala Breeder Sales, Inc. does not conduct a pari-mutuel sport, but is a training facility.

4. The types of non-live wagering that can be conducted at a pari-mutuel venue are simplified and presented here from the perspective of someone who wants to wager on thoroughbred horse racing. There are other ITW and ITWS wagers available on other pari-mutuel sports, but those sports have their own complex and detailed regulations. Thoroughbred horse racing was utilized in this Order because horse racing is the pari-mutuel sport most relevant to this dispute.

5. Gulfstream is not allowed to accept ITWS or ITW wagers when it is not conducting live racing.

6. The second and third categories of wagering are referred to as "simulcasting." *See* Fla. Stat. § 550.002(32)

casts and to accept wagers on out-of-state horse races.[7] *See* Fla. Stat. § 550.3551(5). In other words in Florida, an out-of-state racetrack cannot contract directly with an ITWS site, like a jai alai fronton or greyhound racetrack. The in-state racetrack contracts with ITWS sites. In addition, an ITWS site within sixty miles of an in-state racetrack (which is conducting live racing) must obtain that racetrack's approval before it can accept wagers on ITWS signals. *See* 15 U.S.C. § 3004(b)(1)(A).

In Florida, there are five thoroughbred racetracks.[8] Except for TBD, all of the thoroughbred racetracks are located in south Florida near Miami. During the entire length of TBD's racing season, one of the other four thoroughbred racetracks is operating.[9]

In addition to the five thoroughbred racetracks, there are twenty six other pari-mutuel venues in Florida. TBD and the other thoroughbred racetracks cannot compete to accept wagers from the ITWS sites within sixty miles of their competitor's site, because Section 3004(b) of the Interstate Horseracing Act, 15 U.S.C. § 3001, *et seq.* (the "IHA"), requires an ITWS site within sixty miles of a thoroughbred racetrack to obtain that tracks approval before the site can accept ITWS

wagers. In Florida, this regulation prevents competition between TBD and the other racetracks on twelve of the twenty six venues, because twelve venues are within sixty miles of either TBD (four) or the other thoroughbred racetracks (eight). The remaining fourteen pari-mutuel venues (the "outside ITWS sites") can contract for the right to wager on ITWS signals with whichever of the thoroughbred racetracks is then currently operating.

When an individual places a wager at an ITWS site,[10] most of that wager is placed in a pari-mutuel pool, a portion of which is paid to individual winners. The amount placed in the pari-mutuel pool is referred to as the "handle." *See* Fla. Stat. § 550.002(13). The remaining portion of the wager goes to pay taxes, other statutorily created fees (i.e. breeders' awards), the out-of-state racetrack, the in-state racetrack, the ITWS site, the out-of-state horsemen's group, and for purses at the racetracks. *See, e.g.,* Fla. Stat. § 550.6305(9). This portion of the wager is referred to as the "takeout." *See* Fla. Stat. § 550.002(34).

## B. EXCLUSIVE DISSEMINATION AGREEMENTS

In 1996, Florida relaxed its laws regulating simulcasting to allow what is known as

---

7. From a technical perspective, however, the out-of-state racetracks simulcast their races through satellite television signals to the in-state racetracks and the ITWS sites. Simulcasting through use of satellite signals to both the in-state racetracks and ITWS sites is relatively new to the pari-mutuel industry. Previously, signals were transmitted to the in-state racetracks via cable and re-transmitted to the ITWS sites. Now, out-of-state racetracks provide decoders to the authorized venues that allow them to unscramble their signals.

8. Only four of the thoroughbred racetracks are currently offering live races: TBD, Gulfstream, Calder Race Course, Inc., and Tropical Park, Inc.

9. In addition, two of the four racetracks, Calder and Tropical Park, are owned by the same corporate parent and have in recent times operated out of the same racetrack.

10. The ITWS sites place wagers electronically, which are transmitted first to the in-state racetrack's totalisator and then to the out-of-state racetrack's totalisator. A "totalisator" is a computer system that is "used to accumulate wagers, record sales, calculate payoffs, and display wagering data" in a pari-mutuel facility. Fla. Stat. § 550.002(36).

"full card" simulcasting.[11] Beginning in 1997, Gulfstream began negotiating with racetracks in New York, Louisiana, California, Kentucky, Arkansas, Pennsylvania, Texas, and West Virginia[12] for exclusive dissemination rights to the outside ITWS sites.[13] Each racetrack which granted Gulfstream exclusive disseminate for its signal executed an identical addendum to their simulcasting agreements.[14] The addendum states that "[t]he Host Track [out of state thoroughbred horse track] agrees to … limit the dissemination rights to such other thoroughbred racetrack located within the State of Florida in the manner aforesaid [to the sixty mile zone around the other thoroughbred race track]."[15] TBD was the only thoroughbred racetrack whose racing season overlapped with Gulfstream's racing season. In compliance with their obligations under the addendum, the out-of-state racetracks limited TBD's dissemination rights to ITWS sites within sixty miles of TBD.

On several occasions between 1997–2002, TBD and several of the outside ITWS sites attempted to evade Gulfstream's exclusive dissemination rights. In each case, Gulfstream or the out-of-state racetracks (typi-

11. "Full card" simulcasting refers to unlimited simulcasting.

12. The number of tracks (and number of locations) that were subject to exclusive dissemination agreements increased over time. In 2003, Gulfstream had fourteen exclusive dissemination agreements. Six of the 2003 exclusive dissemination agreements were with racetracks that are owned or controlled by Gulfstream's parent company, Magna Entertainment Corp. ("Magna")

13. Calder Race Course, Inc. and Tropical Park, Inc. also obtained or attempted to obtain exclusive dissemination agreements beginning in 2000. Their exclusive dissemination addendum is identical to the one utilized by Gulfstream. For the 2002–2003 racing season, Calder and Tropical Park received exclusive dissemination rights from approximately eleven out-of-state racetracks. For example, Fair Grounds Corp. granted Tropical Park and Calder exclusive dissemination rights from December 11, 2002 through January 2, 2003. TBD operated during this time period. During the 2002–2003 season, Calder and Tropical Park's racing season overlapped TBD's racing season for a total of thirty days. TBD's racing season in 2002–2003 lasted one hundred thirty four days.

14. Except for with Fair Grounds Corp.'s simulcast contract, the addendum was attached to the Racing Industry Uniform Simulcast Wagering Agreement, Version 002 (the "Uniform Agreement"). In relevant part, the Uniform Agreement contains a clause in Section 17(L) addressing "Third Parties." Section 17(L) states that:

> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the Parties, the Host and Guest Racing Commissions, and their respective successors and permitted transferees and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any Party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any Party to this Agreement. However, whenever this Agreement requires or contemplates action by a third party, such action shall not be an obligation of a Party to this Agreement unless expressly stated therein, but only a condition of the obligations of the obligations of the Parties hereto.

Fair Grounds had its own contract to which the addendum was attached. Fair Grounds' contract does not contain a provision either providing for or restricting third party beneficiaries.

15. The Uniform Agreement contains a limited license for the in-state thoroughbred racetrack to use and retransmit the out-of-state racetrack's copyrighted material. For example, neither Gulfstream nor TBD were assigned the ability to enforce an out-of-state racetrack's copyrights.

cally at Gulfstream's urging) threatened to terminate the outside ITWS sites' signal, sue for damages, or otherwise enforce the exclusive dissemination agreements.[16]

## C. THE DECLARATORY STATEMENT AND ITS RESULT

On September 14, 2002, The State of Florida, Department of Business Regulation, Division of Pari–Mutuel Wagering (the "Division") issued a declaratory statement.[17] The declaratory statement interpreted Florida Statutes Section 550.6305(9)(g)1 and determined whether exclusive dissemination agreements violated Florida Statutes Sections 550.615(3), 550.6305(9)(g)1, and Florida Administrative Code rule 61D–9.001. The Division concluded that Section 550.6305(9)(g)1 obliged TBD to make its ITWS signals available to outside ITWS sites because it accepted wagers on out-of-state thoroughbred races. The Division also concluded that exclusive dissemination agreements that prohibit or operate to restrain rebroadcast of a simulcast signal violate Sections 550.615(3), 550.6305(9)(g)1, and Rule 61D–9.001. The declaratory statement did state, however, that "[n]othing in this declaratory statement should be construed as a statement by the Division that Gulfstream Park has, in fact, violated Section 550.615(3), Florida Statutes or Rule 61D–9.001, Florida Administrative Code."

During the 2002–2003 racing season, TBD entered into agreements with and accepted wagers from a number of outside ITWS sites on out-of-state thoroughbred races, including tracks for which Gulfstream had exclusive dissemination rights. TBD's conduct purportedly breached its agreement with the out-of-state racetracks [18] and interfered in Gulfstream's exclusive dissemination agreements.

## D. PROCEDURAL BACKGROUND

On January 27, 2003, in response to the administrative decision, Gulfstream filed this action seeking this Court to declare certain Florida Statutes and rules preempted by federal copyright law, declaratory relief determining Gulfstream's exclusive dissemination agreements enforceable, and damages for breach of contract (as a third party beneficiary) and tortious interference. TBD answered Gulfstream's complaint and filed a counterclaim against Gulfstream seeking declaratory relief determining Gulfstream's exclusive dissemination agreements unenforceable and damages for violation of federal and Florida antitrust laws.

Gulfstream moved for summary judgment on counts 3 (breach of contract) and 5 (tortious interference) of its second amended complaint and on counts 2 and 3 (federal and Florida antitrust law violations) of TBD's counterclaim. TBD moved for summary judgment on all counts of

---

**16.** Calder and Tropical Park undertook similar actions in response to outside ITWS sites wagering through TBD.

**17.** In 1997, TBD filed a similar complaint with the Division about Gulfstream's exclusive dissemination agreements. The Division concluded that, at that time, it was "unable to assist" TBD. The research memoranda attached to the Division's opinion letter addressed the potential liability for Florida for

undertaking any action against Gulfstream's dissemination agreements. The research memoranda do not provide an alternate interpretation for the applicable statutes and rule.

**18.** None of the racetracks are a party to this dispute. It is also undisputed that none of the out-of-state racetracks have registered any copyrights on any simulcasts.

Gulfstream's second amended complaint and on count 1 of its counterclaim (enforceability of Gulfstream's exclusive dissemination agreements).

## II. SUMMARY JUDGMENT STANDARD

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *See id.* Throughout this analysis, the district court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *See id.* at 255, 106 S.Ct. 2505.

## III. DISCUSSION

After close consideration, this Court concludes that summary judgment should be granted in favor of TBD on all counts of Gulfstream's second amended complaint and count 1 of its counterclaim. This Court also concludes that summary judgment should be granted in favor of Gulfstream on counts 2 and 3 of TBD's counterclaim.

## A. ENFORCEABILITY OF GULFSTREAM'S EXCLUSIVE DISSEMINATION AGREEMENTS

Both TBD and Gulfstream moved for summary judgment on the enforceability of Gulfstream's exclusive dissemination agreements. TBD argues that Gulfstream's agreements are unenforceable under the plain language of Fla. Stat. § 550.615(3), Fla. Stat. § 550.6305(9)(g)1, and F.A.C. 61D–9.001(1)(b) (collectively referred to as the "Florida laws") and under the interpretation provided in the declaratory statement. Gulfstream argues that its agreements are enforceable under the plain language of the Florida laws and the declaratory statement is inapplicable in this factual situation.[19]

In interpreting statutes, a court is to begin the construction of a statutory provision with the words of that provision. *See Jackson v. State Bd. of Pardons and Paroles,* 331 F.3d 790, 794–95 (11th Cir.2003); *CBS, Inc. v. PrimeTime 24 Joint Venture,* 245 F.3d 1217, 1222 (11th Cir.2001). If the plain meaning of the provision is unambiguous, then the judicial inquiry is complete. *See Jackson,* 331 F.3d at 794. In interpreting a statute, a court is to avoid inter-

**19.** Gulfstream spends an inordinate amount of time in its response to TBD's motion for summary judgment on count 3, discussing whether TBD complied with its simulcast agreements with out-of-state racetracks and violated the IHA. This Court would note that whether TBD complied with its simulcast agreements is completely irrelevant to the enforceability of Gulfstream's exclusive dissemination agreements. Further, Section 3005 of the IHA does not allow Gulfstream to bring an action for damages against TBD under the IHA. *See* 15 U.S.C. § 3005.

preting a statute in a manner that causes constitutional difficulties. *See Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund VI, Ltd.,* 953 F.2d 600, 604 (11th Cir.1992); *United States v. Brown,* 731 F.2d 1491, 1494 (11th Cir.1984); *also Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (holding that lower courts run "afoul" of a well established principle of statutory interpretation when they fail to avoid constitutional difficulties by broadly interpreting a statute).

 In Florida, courts give great deference to the interpretation of a statute by an administrative agency charged with the statute's enforcement. *See Donato v. American Telephone & Telegraph Co.,* 767 So.2d 1146, 1153–54 (Fla.2000). Further, an agency's interpretation is not to be overturned unless the interpretation is clearly erroneous or in conflict with the legislative intent of the statute. *See id.* Florida law also provides that an agency can interpret a statute by declaratory statement, even if that interpretation affects the rights of other parties who have not joined the declaratory statement proceeding. *See Florida Dep't of Business and Professional Regulation v. Investment Corp. of Palm Beach,* 747 So.2d 374, 384–85 (Fla.1999) (involving a declaratory statement covering the pari-mutuel industry).

### 1. THE DECLARATORY STATEMENT

 In this case the Division interpreted two sections of the Florida Statutes: Sections 550.9305(g)1 and 550.615(3). First, the Division interpreted Section 550.9305(9)(g)1 to "oblige" a thoroughbred racetrack (TBD) accepting wagers on an out-of-state racetrack simulcast to make that signal available to

ITWS sites. The Division also interpreted Section 550.9305(9)(g)1 as making illegal an exclusive dissemination agreement that prevented dissemination by others of a simulcast signal. Second, the Division interpreted Section 550.615(3) to prohibit exclusive dissemination agreements that operate to restrict the retransmission of a signal by an in-state thoroughbred racetrack to an ITWS site.

Turning to the plain language of the sections, Section 550.6305(9)(g)1 states in relevant part: "[a]ny thoroughbred permitholder which accepts wagers on simulcast signal must make the signal available to any permitholder that is eligible to conduct intertrack wagering ...." Fla. Stat. § 550.6305(9)(g)1. While Section 550.615(3) states in relevant part:

If a permitholder elects to broadcast its signal to any permitholder in this state, any permitholder that is eligible to conduct intertrack wagering ... is entitled to receive the broadcast and conduct intertrack wagering under this section .... A person *may not restrain* or attempt to restrain *any permitholder* that is otherwise authorized to conduct intertrack wagering *from receiving the signal of any other permitholder* or sending its signal to any permitholder.

Fla. Stat. § 550.615(3) (emphasis added).

While Section 550.6315(9)(g)1, by itself, does not directly prohibit an exclusive dissemination agreement, it must be read together with Section 550.615(3), which by its plain language *does prohibit such arrangements.* Moreover, the obvious purpose of these sections when construed together is to promote competition among wagering venues in Florida. This Court cannot conclude that the Division's interpretation was clearly erroneous or in con-

flict with the legislative intent of the statute.

## 2. NO NECESSITY THAT TBD RE-BROADCAST ITS SIGNAL

Given the Division's interpretation of Florida law as contained in the declaratory statement, Gulfstream argues that its exclusive dissemination agreements still do not violate either Section 550.615(3), 550.6305(9)(g)1 or Rule 61D–9.001(1)(b) [20] because neither TBD nor Gulfstream re-broadcast an out-of-state racetrack's simulcast signal. Gulfstream's argument is based on a change in technology that occurred after the statute was enacted. At the time the statute was enacted in 1996, out-of-state racetracks transmitted simulcast signals by cable (or other means) to the in-state racetracks and the in-state racetracks then re-broadcasted the signals to the ITWS sites. Out-of-state racetracks now transmit their simulcast signal via satellite and neither Gulfstream nor TBD actually re-broadcast an out-of-state racetrack's signal.

■ Gulfstream's argument fails. First, if this Court accepted Gulfstream's argument, then almost no ITWS wagering could legally occur in Florida. Under Section 550.3551(5), jai alai frontons, greyhound race tracks, and other non-thoroughbred racing venues cannot directly receive broadcasts from an out-of-state thoroughbred racetrack. *See* Fla. Stat. § 550.3551(3).[21] This Court concludes that Sections 550.6305(9)(g)1 and 550.615(3) should not be construed so that an out-of-state racetrack violates Florida law if it transmits its simulcast signal via satellite.

■ Second, neither Section 550.6305(9)(g)1 nor the last sentence of Section 550.615(3) explicitly require a re-broadcast or retransmission of a signal by TBD. Section 550.6305(9)(g)1 requires that TBD has to make a signal "available." The word "available" as used in Section 550.6305(9)(g)1 could include licensing an ITWS site the right to use a satellite television signal. Similarly, the last sentence of Section 550.615(3) makes it unlawful for a person to "restrain any permitholder ... from receiving the signal of any other permitholder." The plain meaning of this sentence makes it unlawful for anyone to restrain[22] a permitholder (TBD) from licensing or sub-licensing another permitholder (an ITWS site) the right to receive by satellite transmission an out-of-state racetrack's signal to conduct intertrack wagering. Thus, section 550.6305(9)(g)1

**20.** Florida Administrative Code rule 61D–9.001(1)(b) states in relevant part: "[n]o permitholder shall enter a contractual agreement that is in violation of, or may be construed as waiving, the requirements of these rules or Chapter 550, Florida Statutes."

**21.** Section 550.3551(5) reads:
A pari-mutuel permitholder licensed under this chapter may not receive broadcasts of races or games from outside this state except from an out-of-state pari-mutuel permitholder who holds the same type or class of pari-mutuel permit as the pari-mutuel permitholder licensed under this chapter who intends to receive the broadcast.

Fla. Stat. § 550.3551(5).

**22.** Gulfstream also argues that it did not restrain TBD from transmitting its signal. However, Gulfstream's own president testified that the purpose of getting exclusive dissemination agreements was to exclude TBD from competition in providing ITWS signals and wagering to the outside ITWS sites. *See* Dep. of Scott Savin, Vol. I, at 49. Based on his testimony, this Court concludes that Gulfstream's exclusive dissemination agreements violate Section 550.615(3) and Rule 61D–9.001(1)(b).

and the last sentence of Section 550.615(3) do not explicitly require a re-broadcast or retransmission of a signal by TBD.

### 3. PREEMPTION BY THE IHA

■ Gulfstream also argues that this Court's and the Division's construction of the Florida laws cause constitutional difficulties because such regulations would be preempted by the IHA. This Court disagrees and concludes that the Florida laws as interpreted are not preempted by the IHA.[23]

Initially, this Court would note that Gulfstream lacks standing to assert a cause of action for violation of the IHA. *See* 15 U.S.C. § 3005 (only the out-of-state racetrack, out-of-state racing authority, and out-of-state horsemen's group could bring such an action). Next, Section 3001 does not expressly preempt[24] Florida from regulating ITWS wagering. Third, the Florida laws are not preempted by conflict preemption.[25] Section 3001(a) indicates that the states have primary responsibility in regulating gambling occurring in their state. *See* 15 U.S.C. § 3001(a)(1). Indeed, any notion that Sections 3001(a)(2) or 3001(b) indicated a Congressional intent

that concurrent state and federal regulation of interstate horse racing is impossible is directly contradicted by the Senate Judiciary committee's report recommending the passage of the IHA. *See* S.Rep. No. 95–1117, at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 4144, 4146 (stating that regulation of gambling, including gambling on horse races, was a matter of state concern and that the IHA in no way preempted state regulations).

Fourth, the Florida laws in no way compel an out-of-state racetrack, out-of-state racing association, or out-of-state horsemen's group to undertake any action in violation of the IHA. Those groups can choose not to conduct interstate off-track wagering in Florida, if those groups do not want a particular guest site in Florida to receive and wager on their out-of-state racetrack's simulcast signal.[26] Fifth, the IHA grants no right to exclusive dissemination agreements. Gulfstream's reliance on Section 3002(22) is misplaced because that section is a definitional section defining "terms and conditions" and does not grant any party any right under the IHA or expressly or impliedly exclude a State from prohibiting exclusive dissemination agreements. *See* 15 U.S.C. § 3002(22).

**23.** To the extent that Section 550.6305(9)(g)1 requires dissemination by an in-state thoroughbred track to an ITWS site within sixty miles of another in-state thoroughbred racetrack currently conducting live races, 15 U.S.C. § 3004(b)'s approval requirement can be read in without creating a conflict with Florida Statutes Section 550.6305(9)(g)1.

**24.** Express preemption occurs when " 'Congress' command is explicitly stated in the statute's language or implicitly contained in its structure or purpose.' " *Foley v. Luster*, 249 F.3d 1281, 1286–87 (11th Cir.2001) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)).

**25.** Conflict preemption " 'arises when compliance with both federal and state regulations is

a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Foley*, 249 F.3d at 1287 (quoting *Pacific Gas and Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)).

**26.** Numerous of the corporate representatives for the out-of-state racetracks stated that it did not matter to them between Gulfstream or TBD who disseminated their simulcast signal for interstate wagering to the outside ITWS sites.

Therefore, this Court grants TBD summary judgment on count 3 of the second amended complaint and count 1 of the counterclaim (subject to the copyright preemption analysis below).[27]

## B. PREEMPTION BY FEDERAL COPYRIGHT LAW

■■ TBD moved for summary judgment on Gulfstream's copyright preemption claims. Gulfstream asserts that the Florida laws are either expressly preempted by federal copyright law, 17 U.S.C. § 101, et seq. (the "Copyright Act") or preempted under conflict preemption.[28] Express preemption occurs when " 'Congress' command is explicitly stated in the statute's language or implicitly contained in its structure or purpose.' " *Foley v. Luster,* 249 F.3d 1281, 1286–87 (11th Cir. 2001) (citing *Jones v. Rath Packing Co.,*

430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). Section 301 [29] of the Copyright Act expressly preempts all claims equivalent to any of the exclusive rights covered under 17 U.S.C. § 106,[30] if they come within the subject matter of 17 U.S.C. §§ 102, 103.[31] *See* 17 U.S.C. § 301(a). On the other hand, conflict preemption " 'arises when compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Foley,* 249 F.3d at 1287 (quoting *Pacific Gas and Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)).

■ This Court concludes that the Florida laws are not preempted by the Copy-

27. Count 1 of TBD's counterclaim sought declaratory relief on both the copyright preemption and enforceability issues.

28. In its response to TBD's motion for summary judgment, Gulfstream argued that two additional sections of Chapter 550 (Sections 550.6305(10), 550.6305(11)) are preempted by the Copyright Act. Gulfstream's second amended complaint makes no reference to these sections, and the deadline for amending pleadings has expired. This Court declines to consider whether either Section 550.6305(10) or 550.6305(11) are preempted by the Copyright Act. This Court would note that neither section is directly implicated by the allegations contained in the second amended complaint. For example, Section 550.6305(10) only applies to races conducted at an in-state racetrack and does not apply to a re-broadcast of an out-of-state horse race. *See* Fla. Stat. § 550.6305(10).

29. Section 301 of the Copyright Act preempts "... all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright ... are governed exclusively by this title .... [N]o person is entitled to any such work under the

common law or statutes of any State." 17 U.S.C. § 301(a).

The Copyright Act then limits this preemptive effect by excluding certain rights or remedies that arise under the common law or state statutes, including any rule or statute that provides a right or remedy that is not equivalent to any exclusive copyright right. 17 U.S.C. § 301(b). Courts have interpreted that limitation as not preempting various causes of action that have at least one significant or substantial element different than or in addition to a copyright infringement cause of action. *See Foley,* 249 F.3d at 1285–86.

30. Section 106 provides a copyright holder certain exclusive rights, like the ability to reproduce a work, prepare derivative works, and distribute copies of a work (including by transferring ownership of the work).

31. Neither Section 102 nor Section 103 affect the analysis in this case. Section 102 lists the tangible mediums of expression and authorship covered under the Copyright Act. Section 103 describes compilations and derivative works covered under the Copyright Act.

right Act.[32] First, the Florida laws regulate wagering and not rights equivalent to a copyright. The Florida laws are the result of the IHA, and regulate the manner in which ITWS wagering occurs within Florida.[33] In *Turfway Park*, the Sixth Circuit concluded that the First Amendment did not invalidate the IHA because the IHA regulated wagering not simulcasts. *Kentucky Division, Horsemen's Benevolent & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1412 (6th Cir.1994). While the Florida laws refer to simulcasts and the IHA does not, each reference to simulcasts in the Florida laws is followed by the words "conducting intertrack wagering" or something similar. Gulfstream conceded at oral argument that Florida could prohibit ITWS wagering[34] and that such a prohibition would not be preempted by the Copyright Act. Because Florida can prohibit ITWS wagering, it only follows that Florida can regulate ITWS wagering without being preempted by the Copyright Act.

Second, there is no conflict between the Copyright Act and the Florida laws. Nothing in Florida law prevents an out-of-state racetrack from distributing its simulcasts anywhere (i.e. on television, in a theater, or in a sports bar). An out-of-state racetrack retains its right not to grant a license to an in-state racetrack and can still grant exclusive dissemination rights to either Gulfstream or TBD.

The obstacle to the manner in which Gulfstream wishes to contract is the IHA, a federal law, and not Florida law. Section 3004(b)(1)(A) of the IHA requires a pari-mutuel venue contracting with Gulfstream or TBD to obtain the approval of all currently operating thoroughbred tracks within sixty miles of that venue's location. *See* 15 U.S.C. § 3004(b)(1)(A). Both parties contend that this provision creates a sixty mile zone of exclusivity around each of their tracks. This zone of exclusivity causes the out-of-state racetracks to contract with both Gulfstream and TBD because they do not want to be excluded from either market area. It is only then that Florida law applies. Preemption is not implicated when a federal law conflicts with another federal law.

Third, Florida's wagering laws do not stand as an obstacle to the accomplishment of Congress' full purpose and objectives. Congress has repeatedly stated that the States, and not Congress, determine what forms of gambling may occur within their borders. *See* 15 U.S.C. § 3001(a)(1) (indicating that the States have primary responsibility in regulating gambling);[35] 15 U.S.C. § 1172(a) (making it a federal crime to transport a gambling device, but allowing States to exempt devices or from the law altogether); 18 U.S.C. § 1084 (containing a statute making it illegal to bet over wire communications unless both parties

---

**32.** If this Court concluded that the Florida laws were preempted, the remaining provisions regulating the pari-mutuel industry would also be invalid. Fla. Stat. § 550.71.

**33.** The IHA regulates the relationships between out-of-state racetracks, in-state racetracks, both state gaming authorities, and both racetracks' horsemen groups. The Florida laws regulate the relationship between the in-state racetracks and the ITWS sites.

**34.** Such a prohibition would bar dissemination by out-of-state racetracks to either Gulfstream or TBD.

**35.** *Also* S.Rep. No. 95–1117, at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 4144, 4146 (containing the Senate Judiciary committee report stating that regulation of gambling, including gambling on horse races, was a matter of state concern and that neither the IHA nor other federal law preempted those state regulations).

are located in a state that allows such betting).[36] Given the deference that Congress has given to the States to regulate gambling, this Court concludes that the Copyright Act does not preempt the Florida laws. Accordingly summary judgment is granted in favor of TBD on counts 1 and 2 of the second amended complaint.

## C. THIRD–PARTY INTENDED BENEFICIARY THEORY

TBD moved for summary judgment on count 4 of Gulfstream's second amended complaint, arguing that Gulfstream was not an intended beneficiary of TBD's simulcast agreements with out-of-state racetracks. In response Gulfstream argues that its and TBD's agreements with out-of-state racetracks together indicate a clear and manifest intent for Gulfstream to be a third party beneficiary of TBD's agreements.

This Court's holding that Gulfstream's dissemination agreements violated Florida law and are unenforceable conversely mean that the limitations placed in TBD's agreements are, likewise, unenforceable and foreclose Gulfstream's third party beneficiary breach of contract cause of action. Summary judgment is also appropriate on all the out-of-state contracts (except for the contract with Fair Grounds Corp.) because the plain language of each agreement explicitly provides that neither party intended to create any third party beneficiaries. *See Pyles v. United Air Lines*, 79 F.3d 1046, 1049 (11th Cir.1996). This Court grants summary judgment on count

4 of Gulfstream's second amended complaint.

## D. TORTIOUS INTERFERENCE

■ TBD argues that summary judgment is appropriate on count 5 of Gulfstream's second amended complaint because no cause of action for tortious interference exists when the contract interfered with is void. *See Thomas v. Ratiner*, 462 So.2d 1157 (Fla. 3d DCA 1984). Gulfstream argues that summary judgment is inappropriate because a claim of tortious interference exists even if the underlying contract is unenforceable. *See United Yacht Brokers, Inc. v. Gillespie*, 377 So.2d 668 (Fla.1979). This Court concludes that *Ratiner* controls in this case and summary judgment on count 5 is appropriate.

*Ratiner* involved a claim of tortious interference against a lawyer when the lawyer caused a client to breach a retainer contract. *See id.* at 1158–59. The plaintiff was employed as a doctor at a hospital and was also a lawyer. *See id.* While employed at the hospital, the plaintiff procured a retainer agreement from one of his patients for himself. *See id.* The patient subsequently breached the retainer agreement and entered into a second retainer agreement with the defendant. *See id.* The Third District Court of Appeal held that the first retainer agreement was void because it violated a Florida law that made it unlawful for a doctor in a hospital to solicit business for a lawyer. *See id.* at 1159. Because the contract was void, no

**36.** *Also Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (stating that states have a "substantial" governmental interest in restricting and regulating gambling and such regulations represent a well-recognized exercise of state police power); *Casino Ventures v. Stewart*, 183 F.3d 307 (4th Cir.1999) (concluding that federal admiralty laws did not preempt state laws regulating gambling).

action for tortious interference existed. *See id.; also* Restatement (Second) of Torts § 774 (stating that one who "causes the nonperformace of an illegal agreement . . . is not liable for pecuniary harm resulting from nonperformance."). The Third District Court of Appeal distinguished *United Yacht Brokers*[37] and its progeny because those cases involved contracts that were voidable, not void. *See id.* at 1160.

This Court has previously concluded that Gulfstream's exclusive dissemination agreements are void because they violate Florida law. Indeed under Section 550.0251(10), the Division had the authority to fine Gulfstream up to a $1,000 per violation. As such, no cause of action for tortious interference exists and this Court grants summary judgment on count 5 of Gulfstream's second amended complaint to TBD.

### E. TBD'S ANTITRUST CLAIMS

▉ TBD claims that Gulfstream's exclusive dissemination agreements unreasonably restrained competition in violation of Section 1 of the Sherman Antitrust Act and Florida Statutes Section 542.18.[38] Both parties agree that this case involves participants at different levels of distribution and the alleged restraints are "nonprice vertical restraints." Both parties also agree that nonprice vertical restraints are analyzed under the rule of reason. *See, e.g., Maris Distrib. Co. v. Anheuser–Busch, Inc.*, 302 F.3d 1207, 1216 (11th Cir.2002).

The rule of reason requires that TBD prove: (1) an anticompetitive effect of Gulfstream's exclusive dissemination agreements on the relevant market; and (2) no procompetitive benefit or justification to Gulfstream's exclusive dissemination agreements. *See Maris*, 302 F.3d at 1213 (quoting *Levine*, 72 F.3d at 1551). In proving anticompetive effect, TBD can either show: (a) an actual detrimental effect caused by Gulfstream's exclusive dissemination agreements; or (b) a "potential for genuine adverse effects on competition" caused by Gulfstream's exclusive dissemination agreements. *Id.* (quoting *Levine*, 72 F.3d at 1551). TBD produced no evidence of actual detrimental effect, and argued that there is a potential for genuine adverse effects.

▉ In order to prove that there is a potential for genuine adverse effects, TBD must define the relevant market and demonstrate that Gulfstream had market power in that market. *See id.* In defining the relevant market, TBD must identify both the relevant product and geographic market for that product. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir.2002). Construction of the relevant market "must be based on expert testimony." *See id.*

▉ In constructing a product market, an expert is " 'to identify producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services.' " *Levine*, 72 F.3d at 1552 (quoting 2A Phillip E.

---

37. In *United Yacht Brokers*, the contract was unenforceable because the broker failed to comply with a Florida Statute and obtain written authorization before acting on behalf of a principal. 377 So.2d at 669–70.

38. Florida antitrust law defers to federal interpretation of Section 1 of the Sherman Antitrust Act in interpreting what conduct violates Florida Statutes Section 542.18. *See* Fla. Stat. § 542.32; *also Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1556 n. 20 (11th Cir.1996).

Areeda et al., *Antitrust Law* ¶ 530a, at 150 (1995)). The products that make up any given market include those that "'have reasonable interchangeability.'" *Id.* (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). In addition to determining the reasonable interchangeability of a product and its substitutes, a product market can also be defined by "'the cross-elasticity of demand between the product itself and its substitutes.'" *Bailey,* 284 F.3d at 1246 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Within a broad product market, submarkets may exist, which themselves constitute product markets. *See U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 995 (11th Cir.1993). The boundaries of submarkets can be determined by looking at practical indicia such as: "'separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors ....'" *Id.* (quoting *Brown Shoe Co.,* 370 U.S. at 325 n. 42, 82 S.Ct. 1502).

In *Bailey,* the Eleventh Circuit affirmed a district court's grant of summary judgment against an antitrust plaintiff. 284 F.3d at 1247. *Bailey* involved a price discrimination claim brought by a competitor in the liquid propane industry. *See id.* at 1239. The plaintiff's economist opined that the relevant product market was propane gas sold for residential use. *See id.* at 1247. The economist in his report acknowledged that propane gas was viewed as homogeneous by the final consumer (no distinction between commercial and residential uses) and that reasonable substitutes for propane existed (electricity, coal, wood, and oil). *See id.* The economist

quickly dismissed the substitutes for propane gas sold for residential uses (propane gas sold for commercial uses, electricity, coal, etc.) as being included within the relevant product market without performing any economic analysis. *See id.* The Eleventh Circuit concluded that the evidence produced by the economist was insufficient to establish the relevant product market. *See id.*

For similar reasons in *Levine,* the Eleventh Circuit also affirmed a district court's grant of summary judgment. 72 F.3d at 1552–53. *Levine* involved a Section 1 claim against a preferred provider organization ("PPO"). *See id.* at 1541. The plaintiff's economist opined that the relevant market was the provision of internist services to the PPO's patients. *See id.* at 1552. The Eleventh Circuit concluded that insufficient evidence existed because the economist failed to consider the costs to the PPO's patients for switching plans or going to non-PPO physicians. *See id.* at 1553.

■ In this case, TBD's economist, Louis A. Guth, defined the relevant product market as out-of-state thoroughbred race signals (ITWS signals) when Gulfstream and TBD are both operating. Guth based his opinion on: (a) TBD's gambling expert's, Eugene Christiansen, conclusion that wagering on thoroughbred racing was a meaningfully distinct product to other forms of pari-mutuel wagering; (b) the fact that when TBD competed with Gulfstream the ITWS sites share of net proceeds increased as did other benefits; and (c) an application of the United States Department of Justice's (the "DOJ") Horizontal Merger Guidelines. Gulfstream moved for summary judgment arguing that TBD produced no evidence of a relevant product market because Guth's and

Christiansen's testimony should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. This Court concludes that it need not reach the *Daubert* question, because, even if admissible, the evidence presented by TBD's experts do not provide a sufficient basis upon which a reasonable jury could find that the relevant product market is thoroughbred racing ITWS signals from January 3rd through April 24th.

Guth's report and testimony on the relevant product market in this case suffer from the same fatal flaws as did the analysis by the experts in *Bailey* and *Levine.* First, Guth's report on the relevant product market is conclusory. Guth spends just over a page in his relatively short twenty page report reaching his conclusion. Second, Guth does not base his definition of the relevant product market upon a measure of supply or demand elasticity or some other survey or any other detailed economic analysis. Third, even if this Court could conclude that a sufficient basis exists to find that thoroughbred racing constituted the relevant product, TBD has provided no explanation or analysis why: (a) the simulcasts of live thoroughbred races occurring at Gulfstream, TBD, and/or Calder/Tropical Park should not be included in the relevant product market; and (b) the ITWS wagering originating from Calder/Tropical Park should not also be included in the relevant product market.

Neither Guth nor Christiansen provide this Court with any basis for why ITW signals for Gulfstream and TBD's live horseraces simulcast to the outside ITWS sites should not be included within the relevant product market. Similarly, neither Guth nor Christiansen provide this Court with any analysis why a temporal limitation should exist in this case. The sole basis argued by TBD is that Gulfstream and Calder/Tropical Park do not directly compete with each other. Neither of TBD's experts analyzed what effect (if any) that Calder/Tropical Park had or has on competition at ITWS sites. Moreover, TBD's argument overlooks that TBD and Calder/Tropical Park do directly compete for a lengthy period of time. Last year, TBD competed with Calder/Tropical Park for nearly a quarter of its racing season (thirty out of one hundred and thirty four days). The only discussion by either expert about the concurrent period between TBD and Calder/Tropical Park occurs in a footnote in Guth's report where he indicates that TBD's and Calder/Tropical Park's overlap for "several weeks."

In his report, Guth based his conclusion of the relevant product market in part on a gambling expert's conclusion that thoroughbred racing was a meaningfully distinct product to other forms of pari-mutuel wagering.[39] At his deposition Guth, who himself has experience with the economics of horseracing and gambling, testified that based on his experience and previous analysis "[u]ltimate bettors view these things [different gambling products] as substitutes." Guth Depo. at 68. After acknowledging that reasonable substitutes exist (such as other pari-mutuel sports, the lot-

---

**39.** Christiansen's conclusion, however, was not based upon a discrete choice survey of ultimate consumers or even pari-mutuel managers. Guth proposed that such a discrete choice survey of ultimate bettors be performed to determine the relevant market, but TBD elected not to pursue such a survey. Instead, Christiansen's conclusion was based upon his experience in the gambling industry and results of six informal, unscientific interviews with presidents or general managers of Defendants.

tery, and other forms of gambling), Guth retreated from the first basis supporting his relevant product market definition to his second and third bases to support his conclusion.

It appears that Guth's conclusion is now only supported by the fact that the outside ITWS sites did not switch to other gambling products when Gulfstream charged a higher than market "price" from 1997–2002.[40] Other than considering this lone historical fact, Guth did not consider any of the other factors that the Eleventh Circuit enunciated as being necessary to define a submarket. *See, e.g., Anchor,* 7 F.3d at 995 (quoting from *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. 1502 and *International Tel. & Tel. Corp.,* 104 F.T.C. 208, 409 (1984)). For example, Guth performed no analysis of the characteristics, the pricing, or applicable regulation of any of the potential substitutes for thoroughbred ITWS signal. This Court concludes that historical information by itself does not provide a sufficient basis upon which a reasonable jury could find that the relevant product market is thoroughbred ITWS signals.

Guth's conclusion (that ITWS horseracing constitutes a distinct submarket) was also purportedly supported by an application of the Antitrust Division, DOJ, 1992 Horizontal Merger Guidelines, as revised in 1997 (the "Guidelines"). 57 Fed.Reg. 41552. Section 1.11 of the Guidelines contains the analysis that the DOJ uses in determining the relevant market in reviewing horizontal mergers. Section 1.11 states in relevant part:

Specifically, the Agency will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed at least a "small but significant and non-transitory increase in price", but the terms of sale of all products remained constant. If, in response to the price increase, the reduction in sales of the product would be large enough that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Agency will add to the product group the product that is the next best substitute for the merging firm's product.

. . . . .

In general, the price for which an increase will be postulated will be whatever is considered to be the price of the product at the stage of industry being examined. In attempting to determine objectively the effect of a "small but significant and nontransitory" increase in price, the Agency, in most contexts, will use a price increase of five percent lasting for the foreseeable future. However, what constitutes a "small but significant nontransitory" increase in price will depend on the nature of the industry, and the Agency at times may use a price increase that is larger or smaller than five percent.

Guidelines, § 1.11.

This Court concludes that the analysis performed by Guth in this case under the

---

**40.** While this Court is using the term "price," in actuality what is at issue in this case is the percentage of the net proceeds (the amount of the takeout after certain amounts are deducted) that an ITWS site receives. Florida statutorily mandates that ITWS sites receive thirty three percent (with several statutory excep-

tions who receive more). *See* Fla. Stat. § 550.6305(9)(b). TBD claims that in the future in-state thoroughbred racetracks will share a higher percentage of net proceeds with ITWS sites when the in-state racetracks compete. *See, e.g.,* Fla. Stat. § 550.6305(9)(c).

Guidelines does not provide a sufficient basis to survive summary judgment. First, the Guidelines are applied by the DOJ to mergers not Section 1 claims. Second, the Guidelines are not meant for mechanical application (as Guth applied them).[41] *See* Guidelines, § 0 (stating "mechanical application of those [the Guideline's] standards may provide *misleading* answers to the economic questions raised under the antitrust laws") (emphasis added). Third, Guth did not actually apply the Guidelines. The Guidelines are applied to hypothetical future situations and not to historical evidence (as Guth applied them). According to the Guidelines, such analysis is inappropriate and leads to incomplete answers. *See* Guidelines, § 0 (stating that "the picture of competitive conditions that develops from historical evidence may provide an incomplete answer to the forward-looking inquiry of the Guidelines").

Even if it were appropriate to apply the Guidelines to historical evidence, the Guidelines require a price increase be "nontransitory," i.e. lasting for the foreseeable future. *See id.*, § 1.11. In this case, the "price" increase lasted for a transitory period of time, five years. Moreover, to determine what constitutes a "small but significant" price increase, an economist must perform an analysis of the nature of the industry. *See id.* No such analysis was performed in this case.

This Court concludes that in this case there is not a sufficient basis upon which a reasonable jury could find that the relevant product market was thoroughbred ITWS signals from January 3rd through April 24th.[42] Therefore, this Court grants summary judgment against TBD on counts 2 and 3 of its counterclaim.

It is therefore **ORDERED AND ADJUDGED** that:

1. Gulfstream's Motion for Summary Judgment on Counts 3 and 5 of its second amended complaint (Dkt.# 92) is **DENIED**;

2. Gulfstream's Motion for Summary Judgment on Counts 1 and 2 of its second amended complaint (Dkt.# 117) is **DENIED**;

3. Gulfstream's Motion for Summary Judgment on Counts 2 and 3 of TBD's counterclaim (Dkt.# 90) is **GRANTED**;

4. TBD's Motion for Summary Judgment on all counts of the second amended complaint and Count 1 of its counterclaim (Dkt.# 88) is **GRANTED**;

5. Gulfstream's Motions to Strike Expert Reports of Eugene Christiansen and Louis Guth (Dkts.# 63, 69) are **DENIED without prejudice**;

6. Gulfstream's Motion to Exclude Declarations of Guth and Christiansen (Dkt.# 87) is **DENIED**; and

7. Gulfstream's Motion to Strike or Exclude certain portions of declarations and depositions (Dkt.# 138) is **DENIED**.

**41.** In some cases, application of the Guidelines may be useful if correctly applied as one of several methods used to provide a product market definition. *See, e.g., United States v. Archer–Daniels–Midland Co.,* 866 F.2d 242, 248 (8th Cir.1988) (while not explicitly applying Guidelines in Section 1 case, concluding that sugar and high fructose corn syrup were not in the same product market because price supports made a small but significant price increase have no effect on demand).

**42.** Because of this Court's decision, it need not reach Gulfstream's arguments on the geographic market for the product or its market power.

8. Gulfstream's Emergency Motion to Exclude Evidence of Damages for Violation of Mandatory Disclosure Requirements (Dkts.# 151, 152) is **DENIED as moot;**

9. The Clerk is directed to enter judgments in favor of TBD and against Gulfstream on its second amended complaint and on count 1 of TBD's counterclaim and in favor of Gulfstream and against TBD on counts 2 and 3 of TBD's counterclaim; and

10. The Clerk is directed to close this file and terminate all pending motions as moot.