[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-13265
Non-Argument Calendar
_____

D.C. Docket No. 4:15-cv-00388-RH-CAS

PATRICIA N. KALU,
SUSAN LINDER-WYATT,

Plaintiffs-Appellants,

versus

FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(February 27, 2017)

Before ED CARNES, Chief Judge, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiffs Patricia Kalu and Susan Linder-Wyatt are female nurse practitioners at Florida State Hospital, which is overseen by defendant Florida Department of Children and Families. They make nearly $20,000 a year less than a particular male nurse practitioner with the same responsibilities.[1] They sued the Department, contending that that pay disparity violates the Equal Pay Act, 29 U.S.C. § 206(d)(1), and the district court granted summary judgment in favor of the Department. This is Kalu and Linder-Wyatt's appeal.

## I.

The Hospital is located in Chattahoochee, Florida, a small town on the Georgia border. It is responsible for housing and caring for persons who have been found to be not guilty by reason of insanity or who were incompetent to stand trial. Because of its isolated location, its difficult patient population, and its limited budget for employee compensation, it has trouble attracting well-qualified candidates. Kalu and Linder-Wyatt work in the Hospital's Forensic Unit, which is divided into two sections: "Forensic Admissions," which admits male patients and cares for them until they reach a certain point of stability, and "Forensic Central,"

---

[1] All four nurse practitioners relevant to this case — Kalu, Linder-Wyatt, Michael Peel, and Brian Ham — are "advanced registered nurse practitioners." The differences between "advanced registered nurse practitioners" and "nurse practitioners" have no bearing on this case, so for the sake of brevity we will refer to all four as "nurse practitioners."

which admits female patients and houses stable patients of both sexes.[2]  Nurse practitioners in the two sections have the same responsibilities.

According to Dr. Josefina Baluga, the Hospital's executive medical director, she staffs the Forensic Unit on a "global" basis.  That means that she looks at how many employees with the authority to prescribe medication — namely, physicians and nurse practitioners — are in the Forensic Unit as a whole.  She can move prescribing providers between Forensic Central and Forensic Admissions based on need, but she has to have a certain minimum number of prescribing providers in the Forensic Unit or one (or both) of its sections will be understaffed.

This case involves the salaries of three nurse practitioners in the Forensic Unit.  Kalu worked at the Hospital for a total of eight years before leaving to work at the Florida Department of Corrections.  While working at the Department of Corrections she earned $77,000 a year.  When she returned to the Hospital two years later, she requested a 10% raise; that request was denied, so she once again made $77,000 at the Hospital.  She later benefitted from a Department-wide $1000 pay increase, bringing her total compensation to $78,000 a year at the time of this lawsuit.  The other plaintiff, Linder-Wyatt, came to the Hospital in 2008 from the private sector.  Her starting salary was $77,250 a year, but she received the same Department-wide raise as Kalu, increasing her annual wage to $78,250 at the time

---

[2] We refer to Forensic Central and Forensic Admissions together as the "Forensic Unit" for ease of understanding, although it does not appear that the Hospital itself uses that term.

of this lawsuit.  Michael Peel is a male nurse practitioner who previously worked for seven years at the Hospital with an annual salary of $75,000.  In 2013 he started working at the Florida Agency for Persons with Disabilities, where he received a 10% pay raise, bringing his salary to $84,975.

In 2014 another nurse practitioner in Forensic Central, Brian Ham, left for a private-sector job.  Dr. Baluga testified that his departure, combined with the impending retirement of Dr. Dong, a physician in the Forensic Unit, created a "critical need" for another prescribing provider in the Unit.  In the meantime, Kalu transferred to Forensic Central for personal reasons.  She filled Ham's old position, but the transfer created a new vacancy in Forensic Admissions.

In order to fill that critical need promptly, Dr. Baluga reached out to Peel.  Based on his previous experience at the Hospital, she knew that he was comfortable with its location and its patient population, and he had had an "excellent" employment record during his previous tenure there.  Peel said he would consider returning to the Hospital, but only if he received a 10% pay raise (on top of the 10% increase he had received when he started working at the Agency for Persons with Disabilities).  After that conversation, Dr. Baluga posted the job vacancy and Peel was the only applicant.  As a result, Dr. Baluga submitted a request to the Department to hire Peel with a 10% raise, which would result in an annual salary of nearly $95,000.  In her "Justification for Salary Action"

4

explaining her request, she stated that the vacancy was for a "very hard-to-fill position," that Peel was the only applicant, and that the caseload per prescriber was increasing due to Ham's departure and Dr. Dong's imminent retirement. The request was granted and Peel began working in Forensic Admissions.

The result was that there were three nurse practitioners in the Forensic Unit: Kalu and Linder-Wyatt, who made around $78,000 each, and Peel, who made almost $95,000. Kalu and Linder-Wyatt sued the Department, contending that the pay disparity between the two female nurse practitioners on the one hand and the male nurse practitioner on the other violated the Equal Pay Act.

Claims under the Act are analyzed using a burden-shifting framework. First, the employee must present a prima facie case that the Act has been violated. Steger v. Gen. Elec. Co., 318 F.3d 1066, 1077–78 (11th Cir. 2003). Once the employee does that, the burden shifts to the employer to show that there is a permissible reason for the pay disparity. Id. at 1078. If the employer is successful, the burden shifts back to the employee to show that the reasons offered by the employer are "pretextual or offered as a post-event justification for a gender-based differential." Id.

5

In ruling on the Department's motion for summary judgment, the district court found that Kalu and Linder-Wyatt had made out a prima facie case,[3] but that the pay disparity was based on factors "other than sex" and that the Department's stated reasons for the disparity were not pretextual. As a result, the district court granted summary judgment in favor of the Department.

## II.

"We review the district court's grant of summary judgment in [Equal Pay Act] cases de novo." Irby v. Bittick, 44 F.3d 949, 953 (11th Cir. 1995). "Summary judgment is properly granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Id. We must "constru[e] all facts and draw[ ] all reasonable inferences in favor of the nonmoving party." Jones v. UPS Ground Freight, 683 F.3d 1283, 1292–93 (11th Cir. 2012).

### A.

Kalu and Linder-Wyatt contend that the district court was wrong to find that the Department had shown that factors "other than sex" created the pay disparity between them and Peel. Under the Act, a pay disparity is permitted if it results from "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) . . . any other factor other than

---

[3] The Department does not challenge the district court's finding that Kalu and Linder-Wyatt made out a prima facie case.

sex . . . ." 29 U.S.C. § 206(d)(1); Steger, 318 F.3d at 1078. The employer must carry the burden of showing that "the factor of sex provided no basis for the wage differential." Id. "Although an employer may not rely on a 'general practice' as a factor 'other than sex,' it may consider factors such as the unique characteristics of the same job; . . . an individual's experience, training or ability; or . . . special exigent circumstances connected with the business." Id. (citation and some quotation marks omitted).

Here, the Department presented evidence that factors "other than sex" caused the disparity. Specifically, it showed that Peel's salary was a result of exigent circumstances: a critical need for more prescribing providers in the Forensic Unit at the time of Peel's hiring combined with the complete absence of any other applicant and Peel's unequivocal position that he would not return to the Hospital without a 10% pay increase. Unless the Department's explanation was pretextual, those exigent circumstances were a permissible reason for the pay disparity. Accordingly, the district court's finding that the Department carried its burden was correct.

## B.

Kalu and Linder-Wyatt also contend that the reasons for the disparity offered by the Department were pretextual, so summary judgment in the Department's favor was not appropriate.

1.

They first argue that there was no "critical need" in Forensic Central when Peel was hired. If true, that would undermine an important explanation for hiring Peel at all. Kalu and Linder-Wyatt point out that, technically, Kalu was the one who replaced Ham in Forensic Central; if the need in Forensic Central really had been so critical, Kalu (not Peel) would have received the raise. But Dr. Baluga testified that she staffs the Forensic Unit on a "global" basis, so it did not matter whether Ham specifically left Forensic Central or Forensic Admissions, or whether Kalu took his old job. What mattered was that in the wake of Ham's departure, the total number of prescribing providers in the Forensic Unit had decreased by one (and it would soon decrease by two when Dr. Dong retired). As a result, Kalu's moving to Forensic Central did nothing to fill the Forensic Unit's critical need — it may have ameliorated the understaffing problem in Forensic Central, but it created an understaffing problem in Forensic Admissions. The problem was understaffing of prescribing providers, not which part of the Forensic Unit they were in.

Kalu and Linder-Wyatt attack that explanation by asserting that Dr. Baluga does not actually staff on a global basis. They point to a paragraph in Dr. Baluga's affidavit in which she stated that Ham's departure and Dr. Dong's retirement "le[ft] the Forensic Central Unit very short-staffed." (Emphasis added). But in the same paragraph of her affidavit she stated that her goal was "ensur[ing] that an

adequate number of prescribing providers were on staff" because she "assigns staff to cover patients' needs, <u>wherever they are located</u>."  (Emphasis added).  Her phrasing may be odd, but the overall point is clear:  departures in the Forensic Unit as a whole created a global need for prescribing medical staff.  Again, Kalu's transfer could not fill that need.[4]

In addition, Kalu and Linder-Wyatt assert that statements they made in their depositions created a genuine issue of material fact as to whether there was a critical need for another nurse practitioner in the Forensic Unit when Peel was hired.  The record does not support that assertion.  As an initial matter, none of the testimony they cite — with one exception — goes to the need for an additional prescribing provider in Forensic Unit as a whole.

The one exception is Linder-Wyatt's statements during her deposition that "there was not" a critical need in Forensic Admissions and that "[t]here was a need, but not a critical need" in Forensic Central after Ham left and before Peel was hired.  But if a nonmoving party's contradictory evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Bailey v. Allgas, Inc.</u>, 284 F.3d 1237, 1243 (11th Cir. 2002).  Linder-Wyatt

---

[4] Along the same lines, Kalu and Linder-Wyatt claim that Dr. Baluga's "Justification for Salary Action" requesting a raise for Ham (before he left) indicates that there was a critical need only in Forensic Central.  If anything, that letter cuts against their argument, as it states only that Ham worked in "Forensic Services," a term that seems to encompass both Forensic Central and Forensic Admissions.  That suggests that the Forensic Unit as a whole would lose a nurse practitioner.  The letter does not specifically mention Forensic Central or Forensic Admissions.

worked in only one of the two forensic sections and had no experience staffing the Forensic Unit, nor did she have the responsibility that Dr. Baluga did for ensuring that patients were receiving the legally mandated standard of care. Though her personal observation about the workload in the Forensic Unit may provide "some evidence," that "is not sufficient for denial of summary judgment" unless there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. Linder-Wyatt's conclusory statements, without any specifics or supporting evidence, are not enough to create a "genuine issue for trial." See id. (emphasis omitted).

The upshot is that Dr. Baluga's testimony established why there was a critical need in the Forensic Unit at the time of Peel's hiring, and why the higher salary for Peel was necessary; Kalu and Linder-Wyatt failed to rebut that evidence. The district court correctly found that there was no genuine issue of material fact that the explanation was pretextual.

2.

Kalu and Linder-Wyatt's other argument is that the Department did not have a policy of "automatically" offering a 10% pay raise to employees transferring from another agency. As such, they assert that Peel should not have received a 10% pay raise for transferring from the Agency for Persons with Disabilities. But the Department does not claim that Peel received his raise automatically because

10

he was transferring from another agency.  Instead, the Department provided the raise because there was a critical need to fill the vacancy, Peel was the only applicant, he was well qualified, and he would not take the job without the raise. The absence of a general policy of offering raises automatically on the basis of transferring from outside the Department is beside the point.

### III.

Peel benefitted from good timing, but good timing is gender-neutral.  It is a factor "other than sex."  Kalu and Linder-Wyatt did not put forward evidence creating a genuine issue of fact that the Department's offered reasons were pretextual.  As a result, the district court's grant of summary judgment in favor of the Department is due to be affirmed.

**AFFIRMED.**

11